**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MUSARRAT ROOHI HUSAIN, | |
| *Plaintiff*, | |
| v. | Civil Action No. 15-708 (RDM) |
| JOHN BARSA, in his official capacity as Acting Administrator, U.S. Agency for International Development, | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant's motion for summary judgment.  Dkt. 83. Plaintiff Musarrat Roohi Husain alleges that Defendant U.S. Agency for International Development ("USAID") discriminated against her on the basis of her race, sex, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count II), Dkt. 46 at 28–29 (2d Am. Compl. ¶¶ 137–43); retaliated against her for filing Equal Employment Opportunity ("EEO") complaints, also in violation of Title VII (Count I), *id.* at 26–28 (2d Am. Compl. ¶¶ 128–36); and discriminated against her by denying her reasonable accommodations for her disabilities, in violation of the Americans with Disabilities Act of 1973 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973 as amended ("Rehabilitation Act"), 29 U.S.C.§ 701 *et seq.* (Count III), Dkt. 46 at 29–30 (2d Am. Compl. ¶¶ 144–49).  Defendant moves for summary judgment as to all claims.  Dkt. 83.

For the reasons explained below, the Court will grant USAID's motion for summary judgment with respect to Plaintiff's Title VII and ADA claims and will deny the motion with respect to her Rehabilitation Act claim.

## I. BACKGROUND

### A.      Factual Background

The events giving rise to this case unfolded over the course of roughly three years, from 2012 to 2015.  Plaintiff, proceeding *pro se* through most of this litigation, has submitted hundreds of pages of documents but continues to refer to these materials at only a high level of generality, without reference to specific pages or passages.  *See, e.g.*, Dkt. 87-1 at 10 (claiming that "173 pages of email communications by Plaintiff's [u]nion [r]epresentative . . . explain[] all issues very clearly from the beginning to the end, 2013–2014"); *Husain v. Smith*, No. 15-cv-708 (RDM), 2016 WL 4435177, at *1 (D.D.C. Aug. 19, 2016) ("*Husain I*") (noting that Husain has filed more than 500 pages to the docket, but refers generally to "'the exhibits' . . . without specifying where in the lengthy series of exhibits the supporting documents can be found").  As the Court explained in its decision at the motion-to-dismiss stage, it is not the Court's role to hunt through the record in search of facts that might support Plaintiff's claims.  *See Husain*, 2016 WL 4435177, at *1 (declining to "'assume the role of advocate'" for Plaintiff) (quoting *Miller v. Kemp*, No. 11-cv-0530, 2012 WL 1592537, at *3 (N.D. Okla. May 4, 2012)).  Accordingly, the Court relies principally on Defendant's statement of undisputed material facts, Dkt. 83-2, which Plaintiff does not controvert in her opposition, Dkt. 87, despite the Court's admonitions (1) that Plaintiff's opposition should be accompanied by a statement of facts that are in dispute; (2) that the Court would "accept as true any [uncontroverted] factual assertion supported by . . . evidence submitted with [Defendant's] motion;" and (3) that, to controvert such a factual assertion, Plaintiff would need to offer her own evidence and would need to cite "'to particular parts of materials in the record,'" Dkt. 85 at 2–3 (quoting Fed. R. Civ. P. 56 (c)(1)).  With that backdrop, the Court turns to uncontroverted facts.

Plaintiff is "a foreign-born, Asian woman of the Muslim faith" "raised and educated in Zambia." Dkt. 46 at 2, 28 (2d Am. Compl. ¶¶ 3, 139). She began working at USAID in March 2011 as a GS-13 Management and Program Analyst, Dkt. 83-2 at 1 (SUMF ¶ 1), and received a promotion to GS-14 on January 29, 2012, *id.* (SUMF ¶ 2). A little more than a month later, on March 2, 2012, Plaintiff gained a one-year approval to telework on Wednesdays, with every other Friday off, and possible ad hoc telework as needed, *id.* at 1 (SUMF ¶ 3); Dkt. 83-11 (Ex. 9); Dkt. 83-13 at 2 (Ex. 11). This agreement had many conditions. To obtain permission to telework, Plaintiff agreed that her supervisor could "call [her] back to the traditional worksite at any time;" that Plaintiff would "complete all assigned work according to procedures mutually agreed upon by [Plaintiff] and [her] supervisor" in accordance with Plaintiff's work plan; and that Plaintiff would "provide regular reports if required by [her] supervisor to help assess performance." Dkt. 83-11 at 2–3 (Ex. 9).

On April 9, 2012, just weeks after obtaining permission to telework on certain days, Plaintiff was reassigned to the Office of Learning, Evaluation and Research ("LER") at the Bureau for Policy, Planning, and Learning ("PPL") , Dkt. 83-2 at 1 (SUMF ¶ 4); Dkt. 46 at 2 (2d. Am. Compl. ¶ 6); Dkt. 83-4 at 36 (Ex. 2). After transferring to that office, Plaintiff began developing a work plan with her supervisor, Cynthia Clapp-Wincek. Dkt. 83-2 at 1 (SUMF ¶¶ 4–5); Dkt. 83-7 at 6 (Clapp-Wincek Aff.) (Ex. 5). They "had multiple and fairly lengthy conversations" and "drafted and redrafted" a work plan, but for reasons not made clear in the record, Plaintiff wanted to continue these discussions and declined to sign the plan ultimately completed by Clapp-Wincek on May 23, 2012. Dkt. 83-7 at 6 (Clapp-Wincek Aff.) (Ex. 5); *see also* Dkt. 83-2 at 1–2 (SUMF ¶¶ 5–6); Dkt. 83-4 at 36 (Ex. 2). Around the same time, Plaintiff informed Clapp-Wincek that she planned to take "six weeks of medical leave because she had

mononucleosis."[1] Dkt. 83-7 at 6 (Clapp-Wincek Aff.) (Ex. 5). Clapp-Wincek shared this information with staff to explain Plaintiff's absence and in contemplation of sending a get-well card. *Id.* After doing so, Clapp-Wincek was informed that she should not have disclosed Plaintiff's private medical information. *Id.*

After Plaintiff leveled allegations of "biased supervision" against Clapp-Wincek, Dkt. 83-7 at 7 (Clapp-Wincek Aff.) (Ex. 5), PPL management assigned Clapp-Wincek's supervisor, Larry Garber, to serve as Plaintiff's supervisor upon her return from sick leave in October 2012, Dkt. 83-2 (SUMF ¶ 7); Dkt. 83-5 at 5 (Garber Aff.) (Ex. 3). Around this time, Plaintiff communicated to Garber that she was interested in transferring out of PPL to a different office. Dkt. 46 at 5 (2d Am. Compl. ¶ 19); Dkt. 49 at 4 (Ans. to 2d Am. Compl. ¶ 19). Although Garber and Plaintiff discussed new work projects for Plaintiff, they never formally revised the work plan developed by Clapp-Wincek. Dkt. 83-14 at 2 (Ex. 12); 83-5 at 6 (Garber Aff.) (Ex. 3). During the time that Garber served as Plaintiff's supervisor, a number of separate controversies arose. The Court discusses each below.

     1.    *Russia History Project and Telework Conditions*

In November 2012, Plaintiff was assigned to work on a "Russia History Project documenting USAID's involvement in Russia." Dkt. 83-2 at 2 (SUMF ¶ 8). During the months that followed, Plaintiff was not always able or willing to work on the Russia History Project. On

---

[1] Clapp-Wincek's affidavit, Dkt. 83-7 at 6 (Clapp-Wincek Aff.) (Ex. 5), and doctors' notes from April and May 2012 discussed in greater detail below, suggest that this sick leave occurred in April and May 2012, as early as Plaintiff's first day at PPL. The affidavit of Plaintiff's subsequent supervisor, Larry Garber, however, refers only to a sick leave from August to October during 2012. Dkt. 83-5 at 9 (Garber Aff.) (Ex. 3). This latter timeframe is consistent with a second round of doctors' notes, discussed below. Overall, the record suggests that Plaintiff took two extended periods of sick leave during 2012, but resolving this matter decisively is not necessary to deciding the motion before the Court.

March 15, 2013, for example, she "informed her chain of command that from February to mid-March she had concentrated her time on a self-initiated diversity project instead of the Russia History Project she had been assigned." *Id.* (SUMF ¶ 11); *see also* Dkt. 83-16 at 2–3 (Ex. 14). PPL was working on the Russia History Project with another USAID office, and the project developed according to the partnering office's needs.  On April 12, 2013, Garber emailed Plaintiff and another employee, Al Decie, and instructed them "to review [twelve] chapters prepared by another team and [to] prepare a [fifteen-to-thirty]-page paper based on those chapters and other specified materials."  Dkt. 83-2 at 2 (SUMF ¶ 12).  Garber also requested that they send him "a notional timeline" for completing these tasks on or before April 19, 2013.  Dkt. 83-17 at 4 (Ex. 15).  Three days later, on April 15, 2013, Garber sent another email explaining that he hoped the tasks would be completed within four-to-six weeks.  *Id.* at 2 (Ex. 15). Although he sent one more follow-up email on April 25, 2013 asking for the requested timeline, *id.*, he never received the summary from Plaintiff, Dkt. 83-2 at 3 (SUMF ¶ 13).

One month later, on May 26, 2013, Garber forwarded correspondence regarding the Russia History Project to Plaintiff outlining further developments: the partnering office had hired a contractor and no longer needed PPL's help to complete the project.  Dkt. 83-28 at 2–3 (Ex. 26); Dkt. 83-2 at 6 (SUMF ¶ 26).  Garber asked Plaintiff to let him know "what loose ends, if any, [Plaintiff] need[ed] to finish up regarding" the project.  Dkt. 83-28 at 2 (Ex. 26); Dkt. 83-2 at 6 (SUMF ¶ 26).  In the same email, Garber asked Plaintiff to provide, by June 3, 2013, a one-page summary of the work she had done on the project and, by June 15, 2013, a three-to-five-page summary of what PPL should learn from the exercise.  *Id.*  Garber iterated this request in another email to Plaintiff on May 29, 2013, Dkt. 83-2 at 6 (SUMF ¶ 27); Dkt. 83-29 at 2 (Ex. 27), and again on June 12, 2013, Dkt. 83-2 at 8 (SUMF ¶ 33); Dkt. 83-33 at 2 (Ex. 31).

Meanwhile, in March 2013—around the time that Plaintiff informed her supervisors that she had not worked on the Russia History Project for a month and a half—Plaintiff asked to renew her telework agreement from the year before.  Dkt. 83-5 at 9 (Garber Aff.) (Ex. 3). Garber had become "concerned that [Plaintiff] was not undertaking USAID-related work while [teleworking] and, as per the [telework] agreement, was not keeping [him] adequately informed regarding what she was doing."  *Id.* at 10 (Garber Aff.) (Ex. 3).  He therefore declined to renew Plaintiff's telework request for a year, and instead approved telework for two months.  *Id.*  In addition, on May 1, 2013, Garber told Plaintiff that he "require[d] a better mechanism for keeping track of [her] on-going work" and asked for a daily email indicating whether she was in the office or teleworking, with "bullet points listing work-related actions for the day."  Dkt. 83-19 at 2 (Ex. 17); Dkt. 83-2 at 3 (SUMF ¶ 15).  He also said that he wanted to formalize Plaintiff's 2013 work plan within the next two days.  Dkt. 83-19 at 2 (Ex. 17).  Garber required a daily check-in only of Plaintiff, because, according to Garber, "[n]o one else was using [telework] at the time in the same manner as [Plaintiff]," and, moreover, "when other employees [teleworked], [Garber] was reasonably confident that [he] knew what they were doing."  Dkt. 83-5 at 11 (Garber Aff.) (Ex. 3).  Plaintiff responded to this new requirement not by sending the requested daily update, but by sending a weekly email, discussing at a general level the projects she would be working on "each day, at [her] desk and on [telework] days."  Dkt. 83-2 at 7–8 (SUMF ¶¶ 28–29, 32).

On June 15, 2013, instead of providing Garber with the three-to-five-page summary that he requested of lessons for PPL from the Russia History Project, Plaintiff submitted a nineteen-page document consisting largely of her criticism of Garber and his supervisor, Susan Reichle. Dkt. 83-2 at 8 (SUMF ¶ 34).  In this document, Plaintiff asserted, among other things, that

Garber's request in late May (presumably referring to the request for a one-page summary of Plaintiff's work and a three-to-five-page summary of lessons learned) amounted to "ask[ing] [her] to deliver the impossible within [Garber's] own stipulated impossible timeframe;" that Garber had not responded to Plaintiff's requests for guidance; and that Plaintiff had not been provided adequate time or information throughout the project.  Dkt. 83-34 at 2–5 (Ex. 32).  Two weeks later, on June 30, 2013, Garber wrote to Plaintiff explaining that her June 15 submission did "not reflect the product that [one] would expect from someone at [Plaintiff's] grade level," because Plaintiff had "challeng[ed] the basis for the assignment" rather than summarizing lessons learned.  Dkt. 83-38 at 2 (Ex. 36); Dkt. 83-2 at 9 (SUMF ¶ 37).

      2.    *Unauthorized Speaking Engagements*

Plaintiff's supervisors were concerned not only with what Plaintiff was failing to accomplish while teleworking but also with what she was actually doing.  On May 1, 2013, in the same email in which Garber required Plaintiff to send him daily work reports, Garber noted that he had learned that Plaintiff was "advertised as a speaker at a May 6 event at the University of Maryland School of Social Work talking about jobs in the U.S. government."  Dkt. 83-19 at 2 (Ex. 17); *see also* Dkt. 83-2 at 3 (SUMF ¶ 16).  Garber noted that he did "not recall receiving a request" from Plaintiff to participate in the event and, "given both the subject matter and the time of the presentation, formal approval from [Plaintiff's] supervisor . . . [was] required before accepting such invitations."  Dkt. 83-19 at 2 (Ex. 17).  Despite this admonition and without obtaining permission, Plaintiff spoke at the University of Maryland on May 6, 2013 about how to get a federal government job, and materials produced for the event disclosed Plaintiff's position at USAID.  Dkt. 83-2 at 3 (SUMF ¶ 17); Dkt. 83-20 at 2 (Ex. 18).  Plaintiff had also

participated—without clearance—in such a panel at the University of Maryland on April 8,

2013.  Dkt. 83-20 at 2 (Ex. 18); Dkt. 46 at 7 (2d Am. Compl. ¶ 35).

On May 20, 2013, Garber sent Plaintiff a notice of a proposed three-day suspension.  Dkt.

83-20 at 2–5 (Ex. 18).  The memorandum justified the suspension on three grounds: (1) failure to

obtain clearance for the two University of Maryland events, including participating in the second

event on a day that Plaintiff had sought and been granted sick leave; (2) violating federal

regulation 5 C.F.R. § 2635.807(b), which allows government employees to reference their titles

in such panels only as one of several biographical facts; and (3) refusing to honor Garber's

request for daily email updates.  *Id.* at 2–4 (Ex. 18).  Plaintiff did not respond to the charges,

despite receiving multiple extensions to do so.  Dkt. 83-4 at 39 (Ex. 2).  On July 2, 2013, Reichle

sent Plaintiff a decision on the proposed three-day suspension of Plaintiff, imposing a suspension

of two days.  Dkt. 83-39 at 2–4 (Ex. 37).

3.    *Performance Evaluation and Training Requests*

Plaintiff's 2012 performance evaluation, which Garber developed during late 2012 and

early 2013, generated yet another controversy.  On November 21, 2012, Garber requested that

Plaintiff submit a "self-assessment" to help him prepare her evaluation, and, in response,

Plaintiff submitted several letters of reference to Garber.  Dkt. 83-2 at 2 (SUMF ¶ 9); Dkt. 83-14

at 2 (Ex. 12); Dkt. 83-15 at 3–22 (Ex. 13).  Although these references were highly positive, they

did not describe her work for PPL, Dkt. 83-2 at 2 (SUMF ¶ 9); in fact, one letter was dated

"February 24, 1998," Dkt. 83-15 at 16 (Ex. 13), and none of the letters were dated later than May

2012, *id.* at 3–22 (Ex. 13).  Plaintiff also provided Garber with "a four[-]inch thick binder" of her

accomplishments to inform his evaluation.  Dkt. 83-5 at 6 (Garber Aff.) (Ex. 3).

On January 22, 2013, Garber met with Plaintiff to give her a preliminary oral assessment of her performance. *Id.* Plaintiff received her final 2012 performance evaluation on April 26, 2013. Dkt. 83-2 at 3 (SUMF ¶ 14); Dkt. 83-18 at 2 (Ex. 16); Dkt. 83-12 at 2–9 (Ex. 10). The evaluation's written comments praised Plaintiff's work, and she received the second highest score, "Exceeds Fully Successful." Dkt. 83-12 at 2–9 (Ex. 10). Plaintiff objected that she should have received the highest score, "Outstanding;" asserted that Garber had not adequately reviewed the materials she provided him; and further objected that Garber had not been her manager for the minimum 90-days in 2012 to complete the review. Dkt. 83-3 at 3 (EEO Compl. ¶ 1) (Ex. 1); Dkt. 83-4 at 18–19 (Ex. 2); Dkt. 46 at 6 (2d Am. Compl. ¶ 28). She therefore declined to sign the evaluation. Dkt. 83-4 at 18–19 (Ex. 2).

Garber also played a role in Plaintiff's access (or lack of access) to career development opportunities. Throughout 2012 and 2013, Plaintiff made frequent requests to Garber that she be allowed to participate in career training sessions and expressed interest in "temporary duty" assignments. Dkt. 83-2 at 10 (SUMF ¶ 43); Dkt. 83-4 at 23–24 (Ex. 2). Except for two training events in 2013, Garber denied each of her requests. Dkt. 83-4 at 24 (Ex. 2). He did not recommend Plaintiff for any temporary duty opportunities because no opportunities "came to [his] attention of the sort that [Plaintiff] was interested [in] or that [he] was confident that she could professionally complete." Dkt. 83-5 at 12 (Garber Aff.) (Ex. 3); *see also* Dkt. 83-4 at 24 (Ex. 2).

By July 2013, Plaintiff began to claim that Garber was not her legitimate manager. On July 9, 2013, she refused to meet with Garber to discuss her mid-year appraisal and, indeed, refused to meet with him to discuss any topic because she did not view him as her supervisor, notwithstanding his role as Office Director of PPL. Dkt. 83-2 at 9 (SUMF ¶ 38); Dkt. 83-4 at 19

(Ex. 2).  The basis for Plaintiff's belief, evidently, was that she had received only "informal[] and verbal[]" notice that Garber was her manager, which did not constitute sufficient "evidence" of his role.  Dkt. 83-3 at 4 (EEO Compl. ¶ 25) (Ex. 1).  In an email that Plaintiff sent to Garber on July 9, 2013, she claimed that he was not her "official supervisor and yet [he] continue[d] to subject [her] to worse forms of retaliation, threats, abuse of [his] federal authority, hostile work environment and deep[-]rooted harassment as evident in [his] emails since May 16, 2013."  Dkt. 83-40 at 2 (Ex. 38); *see also* Dkt. 83-2 at 9 (SUMF ¶ 39).  Plaintiff asserted that responding to Garber's emails had become a burdensome part of her daily work.  Dkt. 83-40 at 2 (Ex. 38).  She further explained that, going forward, she would dedicate her time to working on a diversity initiative and developing an Equal Employment Opportunity complaint.  *Id.*; Dkt. 83-2 at 9 (SUMF ¶ 39).

    4.    *Plaintiff's Health, Requests for Accommodation, and EEO Complaints*

Throughout her time at PPL, Plaintiff repeatedly took leave from work at the recommendation of her doctors.  Although the exact amount of leave requested or taken is not evident from the record, Plaintiff has submitted multiple letters from her doctors recommending sick leave or telework, which provide some idea of Plaintiff's health issues during this time.  As early as April 6, 2012, three days before Plaintiff joined PPL, her primary care physician wrote a "To Whom It May Concern" letter recommending that Plaintiff rest.  Dkt. 87-5 at 32 (Ex. 5). The same primary care physician wrote a letter recommending that she rest each of the following two weeks.  *Id.* at 30–31 (Ex. 5).  On April 20, 2012, an infectious diseases physician advised rest for the following week, *id.* at 29 (Ex. 5), and for the week after that, *id.* at 28 (Ex. 5). (Although it is not entirely clear from the record that Plaintiff did in fact take medical leave during this time, it seems that these letters reference the same six-week leave that Clapp-Wincek

references in her affidavit.)  *See* Dkt. 83-7 at 6 (Clapp-Wincek Aff.) (Ex. 5) (referencing a six-week period of leave during April and May 2012).  On May 14, 2012, the infectious diseases physician wrote a third "To Whom It May Concern" letter, explaining that Plaintiff had "a probable viral illness that [had] been exacerbated by stress at work."  Dkt. 87-5 at 27 (Ex. 5).  He said that Plaintiff should "continue to telecommute for work until [] May 17" and that she was "medically cleared to physically return to work full time on May 17."  *Id.*

Before long, however, Plaintiff experienced further health issues.  On August 15, 2012, a hospital emergency department referred Plaintiff to a pulmonology and critical care practice, where a doctor wrote a letter recommending that Plaintiff take medical leave "from her stressful work environment," noting that Plaintiff exhibited "vocal cord dysfunction . . . precipitated by psychological stress."  Dkt. 87-5 at 26 (Ex. 5).  According to the doctor, Plaintiff had enrolled in speech therapy to help relax her larynx.  *Id.*  On August 20, 2012, Plaintiff's infectious diseases doctor wrote a letter noting that Plaintiff "continued to have marked fatigue[,] . . . exacerbated by the stress of her job" and that Plaintiff had been seen in the emergency room on two separate occasions for "severe chest pain and the possibility of pulmonary emboli," the latter of which was ruled out with tests.  *Id.* at 25 (Ex. 5).

On August 24, 2012, Plaintiff's primary care physician wrote a letter recommending that Plaintiff be transferred to a different office, explaining that "[s]pecialists have opined that work[-]related stress has been a significant contributing factor to [Plaintiff's symptoms] and transferring to another office would help alleviate her symptoms."  *Id.* at 24.  Neither this letter nor any of the other letters identify what conditions specific to PPL caused this stress, but, according to Plaintiff, "unfavorable discriminatory treatment and marginalization," including having her remarks cut off in meetings, a delay in receiving her annual evaluation form, a delay

in receiving her work plan, and a denial of requests for trainings that non-minority employees received caused her "physical illness and mental stress."  Dkt. 46 at 3 (2d Am. Compl. ¶¶ 9–10).  In light of the health concerns raised by her doctors, Plaintiff received approval for sick leave from August 31 to October 8, 2012.  Dkt. 83-5 at 9 (Garber Aff.) (Ex. 3).  In the months immediately following Plaintiff's return to work, one of her doctors wrote three more letters recommending telework for varying periods of time, although the letters did not mention work-related stress as a cause.  Dkt. 87-5 at 21–23 (Ex. 5).

On May 6, 2013, Plaintiff emailed Reichle (copying others) to request situational telework for medical reasons from May 8 to May 24, 2013.  Dkt. 83-2 at 3 (SUMF ¶ 18); Dkt. 83-21 at 2–3 (Ex. 19).  In her email, Plaintiff alleged that Reichle "fully support[ed] [Garber's] abuse, bullying, [and] reprisal," which created a "hostile work environment," and that Reichle also "dismiss[ed] all measures to" rid the workplace "of discriminatory practices for [Plaintiff] and other [m]inority employees (particularly under PPL/LER)."  Dkt. 83-21 at 2 (Ex. 19).  To the extent that Plaintiff cited specific actions by Garber or Reichle, Plaintiff claimed that Garber was the first supervisor in her career to "raise[] issues" about her telework; that Reichle had sanctioned her; and that both Garber and Reichle were "discrediting [her] good name and providing negative reference[s]."  *Id.* at 3 (Ex. 19).  Claiming that she had "been working under extreme emotional and physical distress solely from [a] hostile work environment . . . since October 2012," Plaintiff's email to Reichle demanded that she "be immediately removed from th[is] hostile work environment and [placed] under a different [s]upervisor who is not hostile."  *Id.* at 2–3 (Ex. 19).  Plaintiff attached to her email a letter from her psychiatrist, F. J. Pepper, M.D., who would go on to write many letters on her behalf.  Dkt. 83-2 at 3–4 (SUMF ¶ 18).  According to Dr. Pepper, Plaintiff suffered "from severe anxiety, depression, and fear, resulting

from a hostile work environment created by her immediate supervisor" and should "be placed under a different supervisor[] immediately." Dkt. 83-22 at 74 (Ex. 20). He also recommended sick leave on May 6 and 7, 2013 (during which Plaintiff made a panel appearance at the University of Maryland) and recommended that she telecommute from May 8 through May 24, 2013. *Id.*

Two days after Plaintiff sent this email, she received a response from Ann Kaufmann, Reasonable Accommodation Manager at USAID's Office of Civil Rights and Diversity ("OCRD"). Dkt. 83-2 at 4 (SUMF ¶ 19). Kaufmann attached two forms for Plaintiff to fill out: (1) a request-for-reasonable-accommodation form requiring a description of the medical condition requiring accommodation and the specific accommodation requested, and (2) an authorization form allowing Plaintiff's doctors to release her medical information to USAID. Dkt. 83-23 at 3–4 (Ex. 21). The same day, Kaufmann sent Plaintiff a "reasonable accommodation interactive dialogue plan" and stressed that, "until [she] receive[d] a description of the essential functions of [Plaintiff's] job and [] daily tasks, [she could not] send [Plaintiff] the medical questionnaire." Dkt. 83-24 at 2 (Ex. 22); Dkt. 83-2 at 4 (SUMF ¶ 20). As Kaufmann explained, she "need[ed] to describe the daily tasks and essential functions of [Plaintiff's] job in the letter to [her] doctor so he [could] properly answer the questionnaire." Dkt. 83-24 at 2 (Ex. 22). Plaintiff, however, emailed Kaufmann on May 16, 2013, asserting, "For OCRD record keeping purposes, I did not request . . . reasonable accommodation." Dkt. 83-25 at 2 (Ex. 23); Dkt. 83-2 at 5 (SUMF ¶ 22). Plaintiff did not explain this decision, other than referring to a "very clear conflict of interest[] and lack of OCRD responsibility about this process." Dkt. 83-25 at 3 (Ex. 23). That same day, she advised OCRD of her intention to file an EEO complaint. Dkt. 83-2 at 5 (SUMF ¶ 23).

On June 21, 2013, shortly after sending her critique of the Russia History Project and shortly before receiving the final decision on her suspension, Plaintiff filed her first, formal EEO complaint, which she then amended several times over the next four months.  Dkt. 83-2 at 8 (SUMF ¶ 35).  Plaintiff alleged discrimination based on her "sex (female), race (Asian), religion (Islam), national origin (Zambia), age (DOB 1962), color (unspecified)[,] and reprisal [due to her opposition to discrimination]."  Dkt. 83-3 at 3 (Ex. 1).  Although Plaintiff's charges ranged widely, they can be grouped into a few categories: (1) dissatisfaction with the timeliness and content of her 2012 performance evaluation, her 2012 and 2013 work plans, and her 2013 mid-year review; (2) dissatisfaction with the conditions that Garber imposed on her teleworking; (3) denial of most training and career development requests; (4) dissatisfaction with the timing and feedback of the Russia History Project; (5) her suspension; and (6) generalized allegations of a hostile work environment.  Dkt. 83-3 at 3–4 (Ex. 1).

On June 26, 2013, Plaintiff "wrote to approximately 80 managers and employees and included attachments exceeding 120 pages of documents," evidently to raise concerns about USAID's handling of diversity in its workforce.  Dkt. 83-2 at 9 (SUMF ¶ 36); *see also* Dkt. 83-37 at 2–3 (Ex. 35).  On July 11, 2013, Plaintiff "included dozens of other USAID personnel (including [USAID] Administrator Rajiv Shah) on a multi-page email to Garber regarding his critique of her Russia History Project submission."  Dkt. 83-2 at 9 (SUMF ¶ 40); *see also* Dkt. 83-41 at 3–4 (Ex. 39).  In the email, Plaintiff alleged that Garber had never raised issues about her performance before his feedback on the Russia History Project and that, in any event, he was not her official supervisor.  Dkt. 83-41 at 3–4 (Ex. 39).  Four days later, on July 15, 2013, USAID's Assistant General Counsel for Ethics and Administration suspended Plaintiff's email privileges, finding that her "numerous lengthy emails to very large numbers of

individuals at [USAID]" violated the agency's email policy, including using "technology resources efficiently and productively" and refraining from "send[ing] email to harass or intimidate others."  Dkt. 83-2 at 9–10 (SUMF ¶ 41) (internal quotation marks omitted); *see also* 83-9 at 5–6 (Peters Aff. ¶¶ 20, 25) (Ex. 7); Dkt. 83-42 at 2 (Ex. 40).  Plaintiff added this action to her EEO complaint.  Dkt. 83-3 at 4 (Ex. 1).

At some point along the way, Plaintiff also submitted a worker's compensation claim, alleging "that she had suffered a workplace injury—specifically [that she] was under stress from her supervisor."  Dkt. 83-8 at 6 (Kolmstetter Aff. ¶ 26) (Ex. 6); *see also* Dkt. 83-9 at 5 (Peters Aff. ¶ 24) (Ex. 7).  On July 15, 2013, the Office of Worker's Compensation informed Plaintiff "that she had not provided sufficient information to support her claims and that she had not specified" her conditions or diagnosis, Dkt. 83-2 at 10 (SUMF ¶ 42); *see also* Dkt. 83-43 at 2–6 (Ex. 41), and it provided her with a questionnaire seeking more specific information about her stress, Dkt. 83-43 at 2–6 (Ex. 41).  During most of August 2013, Plaintiff took leave.  Dkt. 83-2 at 10 (SUMF ¶ 44).  Then, in October 2013, she "was placed on administrative leave, which was extended several times while her worker['s] compensation claims were investigated" and which was extended indefinitely in December 2013.  *Id.* at 11 (SUMF ¶¶ 48, 50).

In response to a letter from a union representative acting on Plaintiff's behalf, the USAID Office of Human Resources explained that "administrative leave [was] not a punitive action" but, rather, merely constituted "time away from work with full pay without charge to leave."  Dkt. 83-48 at 2 (Ex. 46).  The Office explained that it had taken this action because Plaintiff had claimed "that she [felt] she had been harmed in the workplace, and [the Office had] a duty to . . . protect" her.  *Id.*  The email identified the additional information that Plaintiff needed to provide to move her claims forward.  In particular, although USAID had "letters from various physicians

advising . . . that [Plaintiff's] work with . . . Garber [had] created medical problems," the Office

needed "the background medical information that support[ed] those medical conclusions." *Id.*

The Office offered, in the alternative, that Plaintiff could set up an appointment with a Federal

Occupational Health physician. *Id.* Plaintiff consented to the latter, and on March 14, 2014, she

learned that the results of her Federal Occupational Health evaluation "were 'essentially

negative' for physical conditions." Dkt. 83-2 at 11 (SUMF ¶ 51) (quoting Dkt. 46 at 16 (2d Am.

Compl. ¶ 78)); *see also* Dkt. 83-4 at 40 (Ex. 2); Dkt. 83-8 at 5 (Kolmstetter Aff.) (Ex. 6). As a

next step, Plaintiff was required to appear for a Federal Occupational Health psychiatric

examination, Dkt. 83-4 at 40 (Ex. 2), but it is unclear from the record whether she ever appeared

for this examination, and, in any event, she withdrew her worker's compensation claim in April

2014, Dkt. 83-56 at 3 (Ex. 54).

On April 15, 2014, the Department of State's Office of Civil Rights completed its

investigation of Plaintiff's first EEO complaint and found no direct evidence that she had

suffered an adverse employment action due to any unlawful animus. Dkt. 83-2 at 11–12 (SUMF

¶¶ 52–61); *see generally* Dkt. 83-4 (Ex. 2). The investigator noted that he was "hindered [in his

investigation] by a lack of detailed explanation of [Plaintiff's] claims" and further noted that

Plaintiff "did not identify any comparators for any claim." Dkt. 83-2 at 12 (SUMF ¶¶ 59–60).

On April 24, 2014, Garber emailed Plaintiff to welcome her back to work and to give her

new assignments, which Plaintiff, Garber, and another of Plaintiff's supervisors, Patricia Rader,

had discussed the day before. *Id.* (SUMF ¶ 62); Dkt. 83-62 at 2 (Ex. 60); Dkt. 46 at 18 (2d Am.

Compl. ¶ 92). Garber's email concluded, "Let's try to make this work." Dkt. 83-62 at 2 (Ex.

60). The détente was short-lived. On May 14, 2014, Plaintiff emailed Patricia Lamond, Acting

Director of OCRD, and Kaufmann with a reasonable accommodation request. Dkt. 83-2 at 5, 13

(SUMF ¶¶ 23, 64); Dkt. 5 at 58–76.  The accommodation request rehashed the same accusations against PPL and Plaintiff's supervisors that she had previously raised, but also alleged that her supervisors were retaliating against her for filing an EEO complaint.  Dkt. 5 at 60–67.  As an accommodation, Plaintiff requested "[i]mmediate removal from the USAID PPL Bureau . . . to a safe[,] non-threatening work environment."  *Id.* at 62 (emphasis omitted).

In support of her request, Plaintiff attached several letters from her doctors.  One letter from her cardiologist recommended that she be excused intermittently for the next two weeks for medical testing.  *Id.* at 70.  All of the other letters were from Plaintiff's psychiatrist, Dr. Pepper, who asserted that Plaintiff had "developed Post Traumatic Stress disorder (PTSD)," "panic attacks, severe anticipatory anxiety of going back to the same hostile environment, and [d]epression," as a result of a hostile work environment.  *Id.* at 68, 71–73.  Although Dr. Pepper urged in the various letters—dating back to 2013—that USAID transfer Plaintiff either to a different supervisor or a different office, he did not specify which management actions or work conditions in Plaintiff's then-current environment harmed her.  *Id.* at 68–69, 71–73.  Plaintiff supplemented her request with further letters from her doctors in the following weeks.  Dkt. 83-22 at 37–42 (Ex. 20); Dkt. 83-2 at 14–15 (SUMF ¶¶ 68–72).  In one of those letters, dated May 22, 2014, Dr. Pepper made a rare reference to specific conduct: that Garber was no longer Plaintiff's supervisor, and that her new supervisor, Rader, forced her to leave a note as to where she was going each time that she left her office chair.  Dkt. 87-5 at 1–2 (Ex. 5).

A representative from OCRD responded to Plaintiff on May 29, 2014 asking her to complete and to send back an authorization form to allow her doctors to release medical information to OCRD to assist the Office in its review of her claim.  Dkt. 83-2 at 15 (SUMF ¶ 73); Dkt. 83-22 at 53 (Ex. 20).  In reply, Plaintiff—copying others, including Dr.

Pepper—stated that her doctors' letters had "provided all necessary medical information" and that because the letters provided her physicians' contact information, OCRD should "contact them directly" for "further medical clarity." Dkt. 83-22 at 51 (Ex. 20). "Therefore," Plaintiff concluded, "it is not necessary for me to sign the attachment." *Id.*

In the following weeks, Plaintiff repeatedly was out sick. Dkt. 83-2 at 16–17 (SUMF ¶¶ 75–78). It appears from the record that OCRD did not communicate with Plaintiff further about her accommodation request. In addition to filing a request for accommodation, on June 6, 2014, Plaintiff filed a new EEO complaint. *See* Dkt. 83-57 at 2 (Ex. 55) (referring to a complaint initiated on June 6, 2014); Dkt. 83-2 at 17 (SUMF ¶ 80) (referring to an informal complaint filed on June 6, 2014).

On July 8, 2014, Plaintiff received a notice of proposed termination from her supervisor, Patricia Rader. Dkt. 83-2 at 17 (SUMF ¶ 79). The notice identified three grounds for termination: (1) failure to produce any work product since returning to work on April 21, 2014 and Plaintiff's earlier failure to produce work product for the Russia History Project; (2) failure to maintain a regular work schedule as a result of taking more than 200 hours of sick leave since April 21, 2014, with no definite plan to resume work, notwithstanding abandonment of her worker's compensation claim and a resultant "lack of basis for believing [Plaintiff] could be suffering harm in the workplace;" and (3) refusal to meet with Rader without a union representative. Dkt. 83-56 at 2–4 (Ex. 54).

Following several deadline extensions and the filing of a further EEO complaint, Plaintiff appealed her removal on August 12, 2014, Dkt. 83-2 at 17 (SUMF ¶¶ 80–81). On September 4, 2014, Assistant to the Administrator, PPL, Alex Thier, affirmed Plaintiff's termination. Dkt. 46 at 25 (2d Am. Compl. ¶ 123); Dkt. 83-2 at 17 (SUMF ¶¶ 79, 81). However, due to a technical

glitch, Thier had not received Plaintiff's appeal, an error that he did not realize until October 17, 2014.  Dkt. 46 at 25 (2d Am. Compl. ¶ 123); Dkt. 83-2 at 17 (SUMF ¶¶ 79, 81).  He accordingly revoked his previous decision in order to consider Plaintiff's appeal.  Dkt. 83-2 at 17 (SUMF ¶ 81).  Meanwhile, Plaintiff continued to lodge EEO complaints, filing one in August and yet another in September.  *Id.* (SUMF ¶¶ 82–83).  OCRD found these complaints to be "like or related to the [June 21, 2013] EEO complaint pending before the EEOC" and informed her that she could move to amend her EEO complaint if she wanted to add the new claims to the pending proceeding.  Dkt. 83-2 at 17–18 (SUMF ¶ 84) (alteration in original) (quotation marks omitted); *see also* Dkt. 83-59 at 2 (Ex. 57).

On November 25, 2014, Thier issued a decision on the notice of proposed termination, concluding that Plaintiff should be terminated for each of the three grounds raised in the proposal.  Dkt. 83-2 at 18 (SUMF ¶ 85).  With respect to her failure to complete work assignments, Thier noted that, notwithstanding Plaintiff's allegations about the inadequacy of her work plan, she was still "expected to cooperate with [her] supervisor in accomplishing the work of the office."  Dkt. 83-58 at 3 (Ex. 56).  Thier found that, despite this obligation, Plaintiff had produced no "evidence of having satisfactorily completed any work product in 2013 or 2014." *Id.*  As to her failure to maintain a regular work schedule, Thier was unmoved by Plaintiff's assertions that she was forced to take time off because of a hostile work environment, noting that she had "provided no information that indicates what specific actions in the workplace may have caused [her] harm" or why she believed they led to her medical condition.  *Id.*  Finally, Thier found that Plaintiff was insubordinate when she refused to meet with her supervisor, Rader, without a union representative.  *Id.* at 4–5.  He explained that, unless Plaintiff reasonably

believed that she was in danger, she had an obligation "to obey first and grieve later." *Id.* at 4. Plaintiff's termination took effect January 11, 2015.  Dkt. 83-2 at 18 (SUMF ¶ 85).

On January 23, 2015, OCRD dismissed Plaintiff's EEO complaints filed on June 6, 2014, August 14, 2014, and September 16, 2014 on the ground that Plaintiff "already ha[d] an EEO case pending hearing before the EEOC[,] which allege[d] harassment, retaliation, and failure to accommodate," and Plaintiff was free to "raise these [related] issues in the case that [was] pending before the EEOC."  Dkt. 83-57 at 2–3 (Ex. 55).  In February 2015, Plaintiff submitted a fifth and sixth EEO complaint.  Dkt. 83-2 at (SUMF ¶¶ 87–88).  OCRD dismissed those complaints as well, once again explaining that Plaintiff "already had an EEO case pending hearing before the [EEOC], in which [she] allege[d] that the Agency has subjected [her] to harassment and retaliation" and that, as a result, she could raise her additional allegations in that pending case. Dkt. 83-60 at 2–3 (Ex. 58).

## B.    Procedural Background

Plaintiff commenced this action on May 8, 2015.  Dkt. 1–8.  In 2016, the Court dismissed most of Plaintiff's claims in *Husain I*, 2016 WL 4435177.  Plaintiff (represented by counsel at the time) filed a second amended complaint on June 9, 2017.  Dkt. 46.  In it, Plaintiff alleges that USAID violated Title VII by taking discriminatory adverse employment actions against her to create a hostile work environment (Count II).  *Id.* at 28–29 (2d Am. Compl. ¶¶137–43).  As a result, Plaintiff claims she "has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation[], embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury." *Id.* at 29 (2d Am. Compl. ¶ 142).  Plaintiff further alleges that the adverse employment actions culminating in her termination constituted unlawful retaliation under Title

VII, intended to punish her for filing EEO complaints (Count I).  *Id.* at 26–28 (2d Am. Compl. ¶¶ 128–36).  Finally, Plaintiff claims that USAID denied her reasonable accommodation for her disabilities and thereby violated the ADA and Rehabilitation Act (Count III).  *Id.* at 29–30 (2d Am. Compl. ¶¶ 144–49).

Proceedings in this case were delayed based on Plaintiff's medical condition, the appointment and withdrawal of counsel, unsuccessful settlement negotiations, and discovery.  In February 2020, USAID moved for summary judgment, Dkt. 83, and Plaintiff's opposition was finally docketed in October 2020, Dkt. 87-1.

## II.  LEGAL STANDARD

"[A] court's adjudication of a motion for summary judgment under Rule 56 asks whether the moving party is legally entitled to prevail based on the undisputed facts."  *Duffy v. Dodaro*, No. 16-cv-1178, 2020 WL 1323225, at *5 (D.D.C. Mar. 21, 2020).  The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if it is capable of affecting the outcome of the litigation under governing law.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).  In construing the facts, the Court must draw "all justifiable inferences . . . in [the nonmovant's] favor."  *Anderson*, 477 U.S. at 255; *see also Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party meets its burden, then the burden shifts, and the nonmovant must "'make a showing sufficient to establish the existence of an element essential to [her] case, and

on which [she] will bear the burden of proof at trial.'" *Talavera*, 638 F.3d at 308 (quoting *Holcomb*, 433 F.3d at 895). "[A] party opposing a motion for summary judgment," however, "'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Howard v. Locke*, 729 F. Supp. 2d 85, 87 (D.D.C. 2010) (quoting *Anderson*, 477 U.S. at 248).

As the Court noted in this case at the motion-to-dismiss stage, "courts will often consider all of a *pro se* plaintiff's filings—and not merely her complaint"—to determine whether facts remain in dispute. *Husain I*, 2016 WL 4435177, at *1 (citing *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015)). However, "a district court is not 'obligated to sift through hundreds of pages . . . to make [its] own analysis and determination of what may[] or may not' support the plaintiff's claims." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). "[T]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." L.Civ.R. 7(h); *see also Dyer v. McCormick and Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 212 n.2 (D.D.C. 2017).

## III.  ANALYSIS

Plaintiff asserts three claims.  First, she alleges that she was subjected to unlawful discrimination based on her race, sex, national origin, and religion, in violation of Title VII.  Dkt. 46 at 28–29 (2d Am. Compl. ¶¶ 138–43).  Second, she alleges that USAID retaliated against her for filing various EEO complaints, also in violation of Title VII.  *Id.* at 26–29 (2d Am. Compl. ¶¶ 129–38).  Finally, she alleges that USAID failed reasonably to accommodate "her disabilities, including a breakdown in her physical health and severe emotional distress caused by her work environment, despite repeated recommendations from [her] physicians that accommodation was

indicated and necessary." *Id.* at 29–30 (2d Am. Compl. ¶¶ 145–49).  As explained below, only the last of these claims survives USAID's motion for summary judgment.

## A.    Title VII Discrimination Claim

Plaintiff alleges that USAID discriminated against her based on her race, sex, national origin, and religion when it subjected to her to "multiple acts of unfair, humiliating and embarrassing treatment[,] culminating in her termination on false grounds for pretextual reasons." *Id.* at 28 (2d Am. Compl. ¶ 138).  According to Plaintiff, USAID acted "to create a hostile work environment" to induce Plaintiff to resign, "as other minority employees faced with such treatment had done," and, when that effort failed, the agency "terminated [her] on false pretenses." *Id.* (2d Am. Compl. ¶ 140).

Plaintiff's disparate treatment claims fail because (1) many of the alleged wrongs that she invokes, even if true, would not rise to the level of adverse employment action for purposes of Title VII; (2) in other respects, she fails to connect the alleged wrongs to any protected status, and not every workplace wrong is actionable under Title VII; and (3) she has failed to carry her burden of offering evidence that would permit a reasonable jury to find that the non-discriminatory rationales that the agency proffered for taking specific, adverse employment actions were pretextual and that the real reason that the agency fired her was race-, sex-, national-origin-, or religion-based animus.  Finally, to the extent Plaintiff intends to raise a stand-alone hostile work environment claim, that claim also fails, because it rests on the unsupported premise that USAID took multiple adverse employment actions against her based on some unlawful animus.

Title VII prohibits discrimination against employees based on race, color, religion, sex or national origin.  42 U.S.C. § 2000e-2(a).  "Absent direct evidence of discrimination, courts

assessing disparate treatment claims under [Title VII] employ the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Hylton v. Calabria*, No. 17-cv-2023, 2020 WL 6134673, at *4 (D.D.C. Oct. 19, 2020).   Under this framework, a plaintiff must establish a prima facie case of discrimination by showing that "'(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).   If "the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of 'a legitimate, nondiscriminatory [or nonretaliatory] reason' for its actions." *Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

The Court begins with the acts that both parties agree constitute adverse employment actions: (1) Plaintiff's suspension following her unapproved appearance at the University of Maryland; (2) suspension of her email privileges; and (3) termination.   *See* Dkt. 83-1 at 13; Dkt. 46 at 12–13, 26 (2d Am. Compl. ¶¶ 59, 62–63, 124) (referencing email suspension, work suspension, and termination, respectively).   USAID offers nondiscriminatory reasons for each action.   Starting with Plaintiff's suspension for appearing at the University of Maryland event: Garber emailed Plaintiff on May 1, 2013, explaining that he "ha[d] been made aware that [she was] advertised as a speaker at a May 6 event at the University of Maryland School of Social Work talking about jobs in the US government."   Dkt. 83-19 at 2 (Ex. 17).   Garber stressed that Plaintiff had not sought authorization to appear at the event and that, "given both the subject matter and the time of the presentation, formal approval from [her] supervisor (and LPA) [was] required before accepting such invitations."   *Id.*   Yet, despite this admonition, Plaintiff appeared

24

at the event without permission and spoke about applying for federal positions. Dkt. 83-20 at 2 (Ex. 18); *see also* Dkt. 27 at 2 (Ex. 25). Indeed, rather than seek permission, Plaintiff emailed Reichle to request permission to telework that day (and for much of the month of May) "for medical reasons." Dkt. 83-21 at 2 (Ex. 19). Plaintiff ultimately received a two-day suspension in a memorandum citing this incident and Plaintiff's response to Garber as the reasons for suspension. Dkt. 83-39 at 4 (Ex. 37).

USAID has also proffered a legitimate, nondiscriminatory reason for suspending Plaintiff's email privileges. In a detailed memorandum, the agency's designated ethics official, James Peters, explained that Plaintiff's email practices had violated the Executive Branch Standards of Conduct, which require federal employees "'to protect and conserve Government property'" and which prohibits the "'use of such property . . . for other than authorized purposes.'" Dkt. 83-42 at 2 (Ex. 40) (citing 5 C.F.R. § 2635.704(a)). Peters further explained that "[s]ending out mass email to a broad cross section of Agency personnel, containing highly-charged personal allegations[,] is not consistent with authorized purposes for the use of Government property" and that you "may not bombard others with multiple mailings, known as email 'bombing,' and . . . may not send e-mail to harass or intimidate others." *Id.* As an example of Plaintiff's email "bombing," USAID points to a July 11, 2013 email that Plaintiff sent to her supervisor, Lawrence Garber, in which she criticized his management style, accused him of "set[ting] [her] u[p] for performance failure and defamation of [her] competency," and claimed that he "never provided [her with] any guidance." Dkt. 83-41 at 3–4 (Ex. 39); *see also* Dkt. 83-2 at 9–10 (SUMF ¶¶ 40–41). Plaintiff copied more than 75 other USAID employees on that email for no apparent reason. Dkt. 83-41 at 3 (Ex. 39).

Finally, USAID provided a detailed, nondiscriminatory rationale for its decision to terminate Plaintiff's employment.  Consistent with the agency's notice of proposed termination, Dkt. 83-56 (Ex. 54), and after providing Plaintiff with an opportunity to respond, USAID's final decision outlined three grounds for her removal from employment, Dkt. 83-58 (Ex. 56).  First, the deciding official explained that Plaintiff "produced no work product from April 21, 2014 until July 8, 2014" and that the work product that she produced for the Russia History project in 2013 "'did not address the requirements of the Bureau for Policy, Planning, and Learning[] or the requirements of the Europe and Eurasia Bureau.'"  *Id.* at 2 (Ex. 56).  Second, he sustained the charge that Plaintiff failed to maintain a regular work schedule, concluding (1) that she had failed to support her contention that her repeated absences resulted from a hostile work environment and (2) that she refused to discuss a predictable work schedule, despite a letter from her psychiatrist opining that her "sick leave had a definitive end date."  *Id.* at 3–4 (Ex. 56).  Finally, the deciding official concluded that Plaintiff was insubordinate when she refused to meet with her supervisor, Patricia Rader, to discuss her work.  *Id.* at 4 (Ex. 56).  Although Plaintiff explained that she merely refused to attend the meeting without her union representative, the deciding official determined (1) that she was "not entitled to leave the meeting without re-scheduling," as her supervisor requested, and (2) that Plaintiff made no effort to reschedule in the month that elapsed between the aborted meeting and the agency's notice of proposed termination.  *Id.*  And, to the extent Plaintiff maintained that she was unable to meet with her supervisor because the "environment" was "unsafe," Plaintiff failed to offer any "evidence that there was any real threat to [her] safety."  *Id.*

Once an employer proffers "a legitimate, non-discriminatory reason for" taking an adverse employment action, "the district court need not—*and should not*—decide whether the

plaintiff actually made out a prima facie case under" the *McDonnell Douglas* framework. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). "Rather, in considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.*  To be sure, the leap from the *McDonnell Douglas* framework to the questions of pretext and discriminatory purpose is not automatic; to shift the burden back to the plaintiff, the employer must offer competent, credible evidence sufficient to permit a reasonable factfinder to conclude that the employer acted for legitimate, nondiscriminatory reasons that are "'clear and  reasonably specific.'"  *Figueroa v. Pompeo*, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019) (quoting *Segar v. Smith*, 738 F.2d 1249, 1269 n.13 (D.C. Cir. 1984)).  But, once the employer does so, the issue for the Court to decide shifts to the ultimate question whether the Plaintiff has offered evidence that would permit a reasonable jury to find that the employer's asserted nondiscriminatory rationale is pretextual and that, in fact, the employer acted based on discriminatory animus.

Here, USAID's asserted rationales for each of the three adverse employment actions are supported by competent, credible evidence that is clear and specific.  The burden, accordingly, is on Plaintiff to offer evidence that would permit a reasonable jury to find that those rationales are pretextual and that, in fact, USAID penalized Plaintiff because of her race, sex, national origin, or religion.  She offers no such evidence.  At most, Plaintiff offers evidence that she, and her union representative, disagreed with some of USAID's justifications for various actions or requirements.  But it is not the Court's role to "sit as a 'super-personnel department' [to]

27

reexamine" whether the discipline that USAID imposed was warranted in light of Plaintiff's conduct. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)).  Where, as here, the plaintiff fails to offer any evidence that the defendant's asserted rationale was pretextual (and not simply wrongheaded) and that the defendant's actual rationale was discriminatory animus, the Court must grant summary judgment in favor of the defendant.

Rather than address this requirement, Plaintiff responds to USAID's asserted rationales with conclusory statements, vague references to the vast number of documents that she has filed, and epithets directed at opposing counsel. *See generally* Dkt. 87-1.  Beyond these unhelpful assertions, Plaintiff devotes the bulk of her opposition to the contention that USAID is estopped from moving for summary judgment because it did not challenge the claims now at issue at the motion-to-dismiss stage. *Id.* at 6.  That argument is wrong.  Although Plaintiff is correct that USAID did not move to dismiss all of Plaintiff's claims and that the unchallenged claims survived, *Husain I*, 2016 WL 4435177, at *8, that result did not constitute a finding by the Court that Plaintiff had carried her burden as to those claims.  Moreover, and more generally, a defendant does not lose the right to move for summary judgment on a claim merely because it did not move to dismiss that claim.

Nor is the Court persuaded that any of the other employment actions mentioned in Plaintiff's amended complaint suffices to establish a triable issue of fact.  Among other things, she alleges that her supervisors' purported discriminatory animus toward her infected (1) her 2012 performance evaluation, Dkt. 46 at 7 (2d Am. Compl. ¶ 33); (2) their denial of her requests for additional training opportunities, *id.* (2d Am. Compl. ¶ 34) (3) the conditions that they imposed on her teleworking agreement, *id.* at 8 (2d Am. Compl.¶ 37); and (4) their delays in

completing her evaluation and work plans, *id.* at 3 (2d Am. Compl. ¶ 9).  Each of these claims

fails because Plaintiff has failed to offer any evidence that would permit a reasonable jury to find

that the actions affected the terms and conditions of her employment to a degree sufficient to

support a disparate treatment claim.  *See Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53,

60 (2006) ("[A] plaintiff must show an 'adverse employment action,' which [is] defined as a

'materially adverse change in the terms and conditions' of employment." (citation omitted)).

But, even if Plaintiff could clear that threshold requirement, her disparate treatment claim fails

because she offers no evidence that any of these actions was taken because of her protected

status.  The closest Plaintiff comes even to gesturing at a prima facie case is her allegation that

"other non-minority employees" received access to training and career opportunities while she

did not. Dkt. 46 at 3 (2d Am. Compl. ¶ 9).  But Plaintiff offers no evidence to support this

contention, let alone evidence to establish that these non-minority employees were similarly

situated to her.

Finally, to the extent Plaintiff intends to bring a separate claim alleging a hostile work

environment, that claim fails as well.  To withstand USAID's motion for summary judgment,

Plaintiff must offer evidence that would allow a reasonable jury to find that USAID "subjected

[her] to 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or

pervasive to alter the conditions of [her] employment and [to] create an abusive working

environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v.

Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  This is not "a mathematically precise test," leaving

courts to consider "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance."  *Harris*, 510 U.S. at 22–23.  The standard is

meant to be "demanding" enough "to ensure that Title VII does not become a general civility code" or create liability for "the ordinary tribulations of the workplace."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).  The plaintiff, moreover, must show the environment was both "subjectively" and "objectively . . . offensive." *Id.* at 787.

Plaintiff's hostile work environment claim fails for at least two reasons.  First and foremost, she offers no evidence that would permit a reasonable jury to find that the hostile work environment that she alleges "was the result of discrimination based on a protected status." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005).  It is not enough for a plaintiff to show that her employer was "'harsh, unjust, and rude,'" *id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)); rather, the plaintiff must offer some evidence that the hostility was the product of discriminatory animus.  Because Plaintiff has adduced no such evidence, her claim fails.  Second, Plaintiff offers no evidence that her employer engaged in any conduct that was unduly harsh, much less evidence of the type of pervasive harassment that is necessary to recover on a hostile work environment claim.  At least in the present context, requiring that an employee provide reports regarding her day's activities while teleworking, requiring the employee to obtain authorization before appearing at an event (during the workday) to discuss government hiring, failing to provide the employee with unspecified training opportunities, and delaying the completion of evaluations or workplans does not come close to satisfying the "demanding" standard for a hostile work environment claim.  *Faragher*, 524 U.S. at 787.

The Court, accordingly, concludes that USAID is entitled to summary judgment on Plaintiff's disparate treatment claims (Count II).

B.    **Title VII Retaliation Claim**

For similar reasons, the Court is also persuaded that USAID is entitled to prevail on Plaintiff's Title VII retaliation claims.  Plaintiff alleges that the agency took various adverse actions against her because she engaged in protected EEO activity.  She alleges that these retaliatory actions included her suspension and termination, Dkt. 46 at 27 (2d Am. Comp. ¶¶ 131, 133), but also a slew of other actions including "requiring Plaintiff to submit to daily reporting requirements[;] cutting Plaintiff off from USAID email access and IT systems[;] requiring Plaintiff to report for duty when unable to work because of lack of access to email and IT systems thus subjecting [her] to ridicule, embarrassment and humiliation in front of co-employees[;] failing to provide Plaintiff with a timely prepared work plan[;] placing Plaintiff on forced administrative leave[;] and refusing to accommodate Plaintiff's well documented medical and emotional need for assignment to a different supervisor."  *Id.* (2d Am. Compl. ¶ 132). According to Plaintiff, USAID's pattern of retaliatory actions "began within five days after Plaintiff filed her first EEO [c]omplaint."  *Id.* at 26 (2d Am. Compl. ¶ 129).

An employer may not discriminate against an employee because she "has opposed any practice made an unlawful employment practice" by Title VII or "has made a charge" under Title VII.  42 U.S.C. § 2000e-3(a); *see also Burlington*, 548 U.S. at 62.  "To establish a prima facie case of unlawful retaliation, [a] plaintiff must show: '[1] that [she] engaged in a statutorily protected activity; [2] that the employer took an adverse personnel action; and [3] that a causal connection existed between the two.'"  *Singletary v. District of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003) (quoting *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003)).  In the context of a retaliation claim, an action is "materially adverse" if it could "dissuade[] a reasonable worker from making or supporting a charge of discrimination."

31

*Burlington*, 548 U.S. at 68 (internal quotation marks omitted).  If the plaintiff establishes each of the elements of her case, then the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for its actions.  *Singletary*, 351 F.3d at 524 n.5.  If the defendant does so, "'the burden-shifting framework disappears' and the question becomes 'whether a reasonable jury could infer . . . retaliation from all the evidence.'"  *Durant v. District of Columbia*, 875 F.3d 685, 697 (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).  "In rebutting the proffered explanation, the plaintiff may show 'that the legitimate reasons offered by the defendant were not its true reasons[] but were pretext for [retaliation].'"  *Id.* (second alteration in original) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Taylor v. Solis*, 571 F.3d 1313, 1320 n.4 (D.C. Cir. 2009).

Starting with the first element, "[i]t is undisputed that [Plaintiff] engaged in protect[ed] EEO activity starting in May 2013[] and continuing through her termination in January 2015." Dkt. 83-1 at 15.  The parties disagree, however, about whether a reasonable jury could find that the second and third elements of a retaliation claim are satisfied.  In USAID's view, many—but not all—of the alleged retaliatory actions do not amount to adverse employment actions for present purposes.  And, beyond that, USAID argues that Plaintiff has failed to identify evidence that would permit a reasonable jury to find that the challenged actions were, in fact, retaliatory.

The Court agrees that some of the allegedly retaliatory actions at issue, even if true, would not rise to the level of adverse employment actions for purposes of a Title VII retaliation claim.  *See Singletary*, 351 F.3d at 524.  Requiring an employee to obtain advance authorization before attending a non-government event during the workday to discuss government hiring or requiring an employee who is teleworking to provide a daily account of her activities is unlikely to "dissuade[] a reasonable worker from making or supporting a charge of discrimination."

*Burlington*, 548 U.S. at 68 (internal quotation marks omitted).  Similarly, Plaintiff claims that she was not timely provided with a work plan, Dkt. 46 at 27 (2d Am. Compl. ¶ 132), but even setting aside Plaintiff's role in contributing to her work plan's delay, the Court is unpersuaded that an untimely work plan (at least in the present context) constitutes an adverse action sufficient to support a retaliation claim.  The Court need not premise its decision on this ground alone, however, because, as with her disparate treatment claims, Plaintiff has failed to offer any evidence connecting the action to her protected status or has failed to rebut USAID's proffered, nondiscriminatory rationale for the challenged action.

Most fundamentally, Plaintiff offers no evidence that would permit a reasonable jury to find that the various slights and adverse actions that she identifies bore any causal connection to her protected EEO activity.  The only argument that she makes even attempting to connect her EEO activity with USAID's allegedly retaliatory action is temporal proximity.  To be sure, "[a] plaintiff may satisfy th[e] third element of a prima facie case by showing 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'"  *Holcomb*, 433 F.3d at 903 (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).  But this principle comes with two important provisos.  First, although "[t]emporal proximity" can indeed support an inference of causation" for purposes of establishing a prima facie case of retaliation, *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2017), "once a defendant proffers a legitimate reason for its adverse action, temporal proximity standing alone is not sufficient to 'defeat the proffer and [to] support a finding of retaliation,'" *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 109 (D.D.C. 2016) (quoting *Woodruff*, 482 F.3d at 530) (alteration in original).  "At this stage, permitting evidence of temporal proximity to rebut the defendant's showing would be tantamount to 'grant[ing] employees a period of

immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.'" *Id.* at 109–10 (quoting same) (alteration in original). Second, even at the prima facie stage, to satisfy the third element, "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).

Here, USAID has proffered evidence of legitimate, non-retaliatory justifications for most of the actions that Plaintiff cites as retaliatory. As explained above, USAID has proffered credible, legitimate reasons supported by competent evidence for suspending Plaintiff for two days, for suspending her email privileges, and for eventually terminating her employment. The same is true with respect to most of the other actions Plaintiff relies upon in support of her retaliation claim. Assuming for the sake of argument that Garber's request on May 1, 2013 for daily emailed work updates constitutes an "adverse personnel action," *Singletary*, 351 F.3d at 524, for example, Garber explained in an affidavit why he requested that Plaintiff, but not other employees, provide these updates: "No one else was using [telework] at the time in the same manner as [Plaintiff]," and, in any event, "when other employees [teleworked], [Garber] was reasonably confident that [he] knew what they were doing." Dkt. 83-5 at 11 (Ex. 3); *see also* Dkt. 83-2 at 3 (SUMF ¶ 15). The explanation is credible, as it followed on the heels of Plaintiff's disclosing that she had made no meaningful progress on her assigned work, the Russia History Project, for six weeks. Dkt. 83-2 at 2 (SUMF ¶ 11).

Similarly, USAID has explained why it placed Plaintiff on administrative leave during the investigation of her Worker's Compensation claim, Dkt. 83-2 at 11 (SUMF ¶¶ 48, 50): her paid "administrative leave [was] not a punitive action" but, rather, part of the Office's "duty to .

. . protect" Plaintiff while it investigated the allegedly dangerous office.  Dkt. 83-48 at 2 (Ex. 46).  Finally, even if USAID might (at least arguably) have done more to gather information in support of Plaintiff's request for a medical accommodation, the agency has offered a credible, nonretaliatory reason for failing to act on her request: the agency asked that Plaintiff fill out a form authorizing USAID to gather additional information from her doctors, and she never provided the requested form.  Dkt. 83-2 at 15–16 (SUMF ¶¶ 73–74).  Failing to pursue Plaintiff's request for an accommodation further after she failed to respond might (or might not) have been a mistake, but there is no reason to believe that USAID's stated rationale is pretextual and that the agency, in fact, was motivated by retaliatory animus.

The one remaining action that Plaintiff cites as retaliatory does not constitute an adverse employment action, at least when viewed in light of the evidence discussed above.  In particular, she alleges that she was "required . . . to report for duty when unable to work because of lack of access to email and IT systems [and] thus subject[ed]  . . . to ridicule, embarrassment and humiliation in front of co-employees."  Dkt. 46 at 27 (2d Am. Compl. ¶ 132).  But, as explained above, the agency has provided a credible, nonretaliatory rationale for suspending Plaintiff's email privileges.  It is unsurprising that she was nonetheless still expected to report to work.  Any subjective embarrassment that she may have experienced by this requirement, independent of the suspension of the email privileges, does not rise to the level of adverse action sufficient to support a retaliation claim.  The baseline expectation is that those who are employed by the federal government will come to work, even when their capacity to accomplish much is limited.

Thus, for any action that is plausibly adverse, USAID has provided a "legitimate[,] nonretaliatory reason for its action[s]," shifting the burden to Plaintiff to show that a reasonable jury could find that the asserted rationale was pretextual and that, in truth, the action was

retaliatory.  *Singletary*, 351 F.3d at 524 n.5.  Plaintiff asserts that she "strongly disagree[s] with the false narrative manufactured by" USAID, Dkt. 87-1 at 7, and that their justifications "are demonstrably false and pretextual," Dkt. 46 at 27 (2d Am. Compl. ¶ 133), but she fails to identify any evidence that supports that conclusory contention.

Finally, temporal proximity standing alone cannot rebut USAID's legitimate justifications for taking those challenged actions.  Although it is true that many of the adverse actions occurred shortly after Plaintiff engaged in protected activity, during the same time period, Plaintiff failed to work on the Russia Project, refused to send daily email updates, failed to seek approval for speaking engagements, failed to observe rules of conduct governing email, refused to acknowledge Garber as her supervisor, refused to develop a predictable work schedule, and refused to meet with Rader without a union representative.  An employee cannot insulate herself from legitimate, adverse action by continuously engaging in protected activity.  *See Kilby-Robb v. Devos*, 246 F. Supp. 3d 182, 200 (D.D.C. 2017) (noting that Title VII does "not give [a plaintiff] an automatic right to go to a jury on *any* claim of retaliation" merely because she is "involved, at one level or another, in protected EEO activity for most—if not all—of the time" at issue).  Accordingly, even if some of the adverse actions occurred close in time to that activity, Plaintiff must provide more to rebut credible evidence that USAID acted for legitimate, nonretaliatory reasons.  *See Woodruff*, 482 F.3d at 530.

The Court, accordingly, concludes that USAID is entitled to summary judgment on Plaintiff's retaliation claim (Count I).

## C.     ADA/Rehabilitation Act Claim

Finally, Plaintiff claims that USAID violated the ADA and the Rehabilitation Act "by denying her reasonable accommodation for her disabilities, including a breakdown in her

physical health and severe emotional distress."[2]  Dkt. 46 at 29 (2d Am. Compl. ¶ 145).  Because "the Rehabilitation Act provides the exclusive judicial remedy for federal employees who allege that they are victims of workplace discrimination based on disabilities," *Husain I*, 2016 WL 4435177, at *4 (citing *Richardson v. Yellen*, 167 F. Supp. 3d 105, 118 (D.D.C. 2016)), the Court will dismiss Plaintiff's ADA claim and will consider Plaintiff's claim under the Rehabilitation Act alone.

To prevail on a failure-to-accommodate claim, a plaintiff "must produce sufficient evidence that (1) she was a qualified individual with a disability, (2) [her employer] had notice of her disability[,] and (3) [her employer] denied her request for a reasonable accommodation." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014); *see also Woodruff*, 482 F.3d at 527; *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 77 (D.D.C. 2012).  "'[A]n employer is not required to provide an employee [the] accommodation [she] requests or prefers[;] the employer need only provide some reasonable accommodation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (internal quotation marks omitted).

Plaintiff faults USAID for failing to accommodate her request for "a change in supervisors or reassignment to a different position with different supervisors."  Dkt. 46 at 29 (2d Am. Compl. ¶ 146).  USAID responds by arguing that it cannot be faulted for failing to accommodate Plaintiff's asserted disability because, when asked, she failed to provide the agency with a medical release allowing it to make follow-up inquiries with her doctors.  Dkt. 83-

---

[2]  There is some evidence before the Court suggesting that Plaintiff might have developed a brain tumor while at USAID.  Dkt. 12; Dkt. 87-5 at 10–12, 15 (Ex. 5).  This evidence does not, however, have a direct bearing on Plaintiff's Rehabilitation Act claim because there is no reason to believe that USAID (or, indeed, Plaintiff) was aware of this significant medical condition at the time she sought an accommodation.  This new evidence might, however, bolster Plaintiff's contention that she was suffering from an actual disability, even if undiagnosed at the time.

1 at 26–29.  In USAID's view, that omission amounts to an abandonment of her request of an

accommodation or a failure to engage in the interactive process required by the Rehabilitation

Act.  *Id.* at 29.

"Once [an] employer knows of [an employee's] disability and the employee's desire for

accommodations, 'it makes sense to place the burden on the employer to request additional

information that the employer believes it needs.'"  *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41

(D.D.C. 2011) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999)).

Because "[f]ew disabilities are amenable to one-size-fits-all accommodations[,] . . . an employer

needs information about the nature of the individual's disability and the desired

accommodation—information typically possessed only by the individual or her physician."

*Ward*, 762 F.3d at 31.  Notwithstanding this burden, however, employers do not bear sole

responsibility for gathering information and arriving at a reasonable accommodation.  Rather, the

Rehabilitation Act requires "'a flexible give-and-take' between employer and employee 'so that

together they can determine what accommodation would enable the employee to continue

working.'"  *Id.* at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir.

2005)); *see also Duffy v. Dodaro*, No. 16-cv-1178, 2020 WL 1323225, at *13 (D.D.C. Mar. 21,

2020).

The governing regulations also reflect this understanding:

> To determine the appropriate reasonable accommodation[,] it may be necessary for
> the [employer] to initiate an informal, interactive process with the individual with
> a disability in need of the accommodation.  This process should identify the precise
> limitations resulting from the disability and potential reasonable accommodations
> that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3); *see also Ward*, 762 F.3d at 32; *Mogenhan v. Napolitano*, 613 F.3d

1162, 1167 & n.4 (D.C. Cir. 2010).  Notably, "'neither party should be able to cause a

breakdown in the process for the purpose of either avoiding or inflicting liability.'" *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805) (alteration in original).  When the interactive process fails, "courts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Id.* (quoting same).

USAID maintains that "when asked to complete medical releases so that [USAID's] EEO staff could make follow-up inquiries regarding her alleged disabilities and their connection with her work duties, Plaintiff either terminated the EEO process or did not comply."  Dkt. 83-1 at 28–29.  The Court agrees that Plaintiff terminated the interactive process with respect to her 2013 request for telework.  When OCRD staff contacted Plaintiff with specific requests for more information about her request for medical accommodation in May 2013, Plaintiff did not provide the requested information and, instead, responded: "For OCRD record keeping purposes, I did not request . . . reasonable accommodation."  Dkt. 83-25 at 2 (Ex. 23); *see also* Dkt. 83-2 at 5 (SUMF ¶ 22).  When, as here, an employee "walk[s] away" from a seemingly good-faith effort by the employer to gain more information about a request for accommodation, a plaintiff causes the interactive process to break down and cannot prevail on a failure-to-accommodate claim against the employer.  *Ward*, 762 F.3d at 33–35.

The Court is unpersuaded, however, that Plaintiff indisputably terminated the interactive process with respect to her second request for a reasonable accommodation in 2014.  On April 28, 2014, OCRD staff notified Plaintiff of receipt of her request for reasonable accommodation.  Dkt. 83-2 at 13 (SUMF ¶ 63).  Over the following month, Plaintiff continued to email OCRD staff and others with her reasonable accommodation application and with letters from her doctors.  *Id.* at 13–15 (SUMF ¶¶ 64–72).  On May 29, 2014, a member of OCRD emailed Plaintiff, stating:

> We may need to discuss or seek clarification from your doctors on the information provided. As such, we ask [that] you complete and send back the attached [Authorization] form.

Dkt. 83-22 at 53 (Ex. 20).  On June 2, 2014, Plaintiff responded, copying Dr. Pepper and explaining:

> I am including Dr. F.J. Pepper, my [p]sychiatrist, in this communication as I give Dr. Pepper[] my permission to respond to any/all medical clarity [inquiries] that USAID/OCRD is now requiring.  Therefore, it is not necessary for me to sign the attachment.

*Id.* at 51 (Ex. 20).  From the record, it is not clear whether anyone from OCRD ever contacted Plaintiff again.  It is clear, however, that Plaintiff continued to contact OCRD, as evidenced by emails inquiring into the status of her application sent on June 16, 2014 and June 26, 2014.  *Id.* at 48–50 (Ex. 20).

Plaintiff's June 2, 2014 email does not amount to the type of unambiguous termination or abandonment of the interactive process that courts have found fatal to reasonable accommodation claims.  Plaintiff did not, for example, resign from her job in response to requests for more information, *Ward*, 762 F.3d at 33; *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308–09 (D.C. Cir. 2010), nor did she unambiguously refuse to provide more information, *see Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 618 (10th Cir. 1998); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1136–37 (7th Cir. 1996).  It may be that Plaintiff's response was legally insufficient to release her medical information or that it was inadequate because she only copied one of her doctors.  But the existing record does not reveal any attempt by USAID to explain to Plaintiff the inadequacy of her response or to clarify the effect of that response on her accommodation request.  To the contrary, Plaintiff's subsequent emails suggest that she believed her accommodation request was very much alive.  If USAID did explain to Plaintiff the inadequacy of her response, then Plaintiff's ongoing refusal to sign the appropriate authorization

form might have constituted a refusal to complete the interactive process.  But as the record

stands, USAID has failed to carry its burden of showing that "[n]o reasonable jury could find

that" Plaintiff was willing to and did continue participating in the interactive process required to

pursue a reasonable accommodation.  *Ward*, 762 F.3d at 31.

Finally, USAID also asserts—albeit in passing—that Plaintiff has not met her burden of

showing "that she was denied a reasonable accommodation." Dkt. 83-1 at 28; *see also* Dkt. 86 at

9.  It may be that there is something to this argument.  It is far from clear, for example, that the

accommodations that Plaintiff sought (including a new supervisor or transfer to a different

office) would have helped her perform the essential functions of her job, and, as the Supreme

Court has observed, "[a]n *ineffective* 'modification' or 'adjustment'" is not an *accommodation* of

"a disabled individual's limitations." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002); *see*

*also* 29 C.F.R. § 1630.2(o)(ii) ("[R]easonable accommodations" are "[m]odifications or

adjustments to the work environment, or to the manner or circumstances under which the

position held . . . is customarily performed, that *enable* an individual with a disability who is

qualified to perform the essential functions of that position." (emphasis added)).  Plaintiff, after

all, had difficulty functioning under the direction of a variety of supervisors.  *See, e.g.*, Dkt. 83-

10 at 5 (Lamond Aff.) (Ex. 8) (mentioning several of Plaintiff's complaints across different

offices and supervisors).  That question, however, is not properly before the Court because

USAID never developed its argument, and a single, conclusory clause in a single sentence is

insufficient to carry a movant's summary judgment burden of showing "that there is no genuine

dispute as to any material fact and [that it] is entitled to judgment as a matter of law," Fed. R.

Civ. P. 56(a).  A plaintiff cannot be expected to refute an argument that the defendant never

made—or one that the movant made with such brevity that the substance of the argument is not apparent.

The Court, accordingly, concludes that USAID is entitled to prevail on Plaintiff's ADA claim but that it is not entitled to summary judgment on Plaintiff's Rehabilitation Act claim (Count III).

## CONCLUSION

For the reasons explained above, the Court **GRANTS** USAID's motion for summary judgment as to Counts I and II, **GRANTS** USAID's motion with respect to the ADA claim contained in Count III, and **DENIES** USAID's motion with respect to Plaintiff's Rehabilitation Act claim contained in Count III.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 19, 2021