**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MUSARRAT ROOHI HUSAIN,<br><br>        *Plaintiff*,<br><br>    v.<br><br>SAMANTHA POWER,[1] in her official<br>capacity as Administrator, U.S. Agency for<br>International Development,<br><br>        *Defendant*. | Civil Action No. 15-0708 (RDM) |

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court on Defendant's renewed motion for summary judgment. Dkt. 93.  As relevant here, Plaintiff Musarrat Roohi Husain alleges that Defendant U.S. Agency for International Development ("USAID") discriminated against her by denying her reasonable accommodations for her disabilities in violation of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*  Dkt. 46 at 29–30 (2d Am. Compl. ¶¶ 144–49). For the reasons that follow, the Court will **GRANT** USAID's renewed motion for summary judgment.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the current Administrator of the United States Agency for International Development, Samantha Power, "is automatically substituted as a party" with no effect on Husain's "substantial rights."  Fed. R. Civ. P. 25(d).

# I. BACKGROUND

## A.    Factual Background

The Court has previously recounted the factual background of this case in detail, *see* Dkt. 88, and, for present purposes, repeats only that portion of the background necessary for the disposition of the pending motion.

In describing the relevant factual context, the Court relies principally, as it has previously, on USAID's Statement of Undisputed Material Facts ("SUMF"), Dkt. 83-2, which USAID incorporates into its renewed motion for summary judgment, Dkt. 93-1 at 6.  Despite the Court's repeated admonitions to comply with the strictures of Local Rule 7(h) and Federal Rule of Civil Procedure 56, *see* Dkt. 94 at 2–3; Dkt. 85 at 2–3, Plaintiff's opposition to USAID's renewed motion for summary judgment has again failed to controvert USAID's SUMF or to direct the Court to specific documents in the record that support her factual assertions, beyond the general references to Defendant's "many false statements" that are "established by evidence in the record."  Dkt. 96 at 19; *see also id.* at 21 (pointing to "all evidence filed over the last 6 years" and "all 7 Exhibits" attached to Plaintiff's opposition (emphasis removed)).  As the Court previously explained, *see Husain v. Smith*, No. 15-cv-708, 2016 WL 4435177, at *1 (D.D.C. Aug. 19, 2016) ("*Husain I*"); *Husain v. Barsa*, No. 15-cv-708, 2021 WL 663206, at *1 (D.D.C. Feb. 19, 2021) ("*Husain II*"), it is not the Court's function to "assume the role of an advocate" for Husain or to hunt through the voluminous record in this case in search of facts to support her motion.  *Husain I*, 2016 WL 4435177, at *1; *Husain II*, 2021 WL 663206, at *1.  Against that backdrop, the Court considers the uncontroverted facts.

Plaintiff began working at USAID in March 2011 as a GS-13 Management and Program Analyst, Dkt. 83-2 at 1 (SUMF ¶ 1), and received a promotion to GS-14 on January 29, 2012, *id.*

(SUMF ¶ 2).  Beginning in April 2012, Plaintiff was reassigned to USAID's Bureau for Policy, Planning, and Learning ("PPL").  *Id.* (SUMF ¶ 4).  After Plaintiff leveled allegations of "biased supervision" against her initial supervisor, Cynthia Clapp-Wincek, Dkt. 83-7 at 7 (Clapp-Wincek Aff.) (Ex. 5), PPL management assigned Clapp-Wincek's supervisor, Larry Garber, to serve as Plaintiff's supervisor, Dkt. 83-2 (SUMF ¶ 7); Dkt. 83-5 at 5 (Garber Aff.) (Ex. 3).  A variety of controversies arose while Garber was Plaintiff's supervisor in PPL, *see Husain II*, 2021 WL 663206, at *3–5, most of which the Court need not recount to resolve the instant motion.  The Court focuses, instead, on Plaintiff's medical concerns that arose during her assignment to PPL and her requests for accommodation to address those issues.

As early as April 2012, right before and after she joined PPL, Plaintiff began to submit a series of letters from physicians recommending medical leave and accommodations of different varieties.  That month, multiple physicians wrote letters recommending that Plaintiff rest for a series of week-long stretches. Dkt. 87-5 at 28–32 (Ex. 5).  On August 15, 2012, a hospital emergency department referred Plaintiff to a pulmonology and critical care practice, where a doctor wrote a letter recommending that she take medical leave "from her stressful work situation" and explaining that she exhibited "vocal cord dysfunction . . . precipitated by psychological stress." *Id*. at 26 (Ex. 5).  On August 20, 2012, Plaintiff's infectious disease doctor wrote a letter noting that she "continued to have marked fatigue[,] . . . exacerbated by the stress of her job" and that she had been seen in the emergency room on two separate occasions for "severe chest pain and the possibility of pulmonary emboli." *Id.* at 25 (Ex. 5).  On August 24, 2012, Plaintiff's primary care physician wrote a letter recommending that she be transferred to a different office, explaining that "[s]pecialists have opined that work[-]related stress has been a significant contributing factor to [Plaintiff's symptoms] and [that] transferring [her] to another

office would help alleviate her symptoms." *Id.* at 24.  Neither this letter nor any of the other letters identify what circumstances specific to PPL caused this stress, but, according to Plaintiff, "unfavorable discriminatory treatment and marginalization" caused her "physical illness and mental stress."  Dkt. 46 at 3 (2d Am. Compl. ¶¶ 9–10).  In light of the health concerns raised by her doctors, Plaintiff received approval for sick leave from August 31 to October 8, 2012.  Dkt. 83-5 at 9 (Garber Aff.) (Ex. 3).

In the months immediately following Plaintiff's return to work, one of Plaintiff's doctors wrote three more letters recommending telework for varying periods of time, although the letters did not mention work-related stress as a cause.  Dkt. 87-5 at 21–23 (Ex. 5).  On May 6, 2013, Plaintiff emailed Garber's supervisor, Susan Reichle, to request situational telework for medical reasons from May 8 to May 24, 2013.  Dkt. 83-2 at 3 (SUMF ¶ 18); Dkt. 83-21 at 2–3 (Ex. 19).  Claiming that she had "been working under extreme emotional and physical distress solely from [a] hostile work environment . . . since October 2012," Plaintiff's email to Reichle demanded that she "be immediately removed from th[is] hostile work environment and [placed] under a different [s]upervisor who is not hostile."  Dkt. 83-21 at 2–3 (Ex. 19).  Plaintiff attached to her email a letter from her psychiatrist, F. J. Pepper, M.D., who indicated that she suffered "from severe anxiety, depression, and fear, resulting from a hostile work environment created by her immediate supervisor" and should "be placed under a different supervisor[] immediately."  Dkt. 83-22 at 74 (Ex. 20).

Two days after Plaintiff sent this email ("the 2013 request"), she received a response from Ann Kaufmann, Reasonable Accommodation Manager at USAID's Office of Civil Rights and Diversity ("OCRD").  Dkt. 83-2 at 4 (SUMF ¶ 19).  Kaufmann attached two forms for Plaintiff to fill out: (1) a request-for-reasonable-accommodation form requiring a description of

the medical condition requiring accommodation and the specific accommodation requested, and (2) an authorization form allowing Plaintiff's doctors to release her medical information to USAID.  Dkt. 83-23 at 3–4 (Ex. 21).  The same day, Kaufmann sent Plaintiff a "reasonable accommodation interactive dialogue plan" and stressed that, "until [she] receive[d] a description of the essential functions of [Plaintiff's] job and [] daily tasks, [she could not] send [Plaintiff] the medical questionnaire."  Dkt. 83-24 at 2 (Ex. 22); Dkt. 83-2 at 4 (SUMF ¶ 20).  As Kaufmann explained, she "need[ed] to describe the daily tasks and essential functions of [Plaintiff's] job in the letter to [her] doctor so he [could] properly answer the questionnaire." Dkt. 83-24 at 2 (Ex. 22).  Plaintiff, however, emailed Kaufmann on May 16, 2013, asserting, "For OCRD record keeping purposes, I did not request . . . reasonable accommodation," Dkt. 83-25 at 2 (Ex. 23); Dkt. 83-2 at 5 (SUMF ¶ 22), thereby terminating the "interactive process" that Defendant initiated, *Husain II*, 2021 WL 663206, at *17.  Plaintiff did not explain this decision, other than referring to a "very clear conflict of interest[] and lack of OCRD responsibility about this process." Dkt. 83- 25 at 3 (Ex. 23).

On June 21, 2013, Plaintiff filed her first, formal EEO complaint, which she amended several times over the next four months.  Dkt. 83-2 at 8 (SUMF ¶ 35).  She alleged discrimination based on her "sex (female), race (Asian), religion (Islam), national origin (Zambia), age (DOB 1962), color (unspecified)[,] and reprisal [due to her opposition to discrimination]."  Dkt. 83-3 at 3 (Ex. 1).  At some point along the way, Plaintiff also submitted a worker's compensation claim, alleging "that she had suffered a workplace injury—specifically [that she] was under stress from her supervisor."  Dkt. 83-8 at 6 (Kolmstetter Aff. ¶ 26) (Ex. 6); *see also* Dkt. 83-9 at 5 (Peters Aff. ¶ 24) (Ex. 7).  Plaintiff took leave during most of August 2013, Dkt. 83-2 at 10 (SUMF ¶ 44), and was eventually "placed on administrative leave" in

October 2013, which was (1) "extended several times while her worker['s] compensation claims were investigated" and (2) extended indefinitely in December 2013. *Id.* at 11 (SUMF ¶¶ 48, 50). The USAID Office of Human Resources explained that "administrative leave [was] not a punitive action," but that it had taken this action because Plaintiff had claimed "that she [felt] she had been harmed in the workplace, and [the Office had] a duty to ensure a safe workplace." Dkt. 83-48 at 2 (Ex. 46).

Plaintiff returned to work in April 2014, at which point she was supervised by Garber and a newly added supervisor, Patricia Rader. Dkt. 83-2 at 11 (SUMF ¶ 62); Dkt. 83-62 at 2 (Ex. 60); Dkt. 46 at 18 (2d Am. Compl. ¶ 92). Shortly after her return to work, on May 14, 2014, Plaintiff emailed Kaufmann and Patricia Lamond, Acting Director of OCRD, with another reasonable accommodation request ("the 2014 request"). Dkt. 83-2 at 13 (SUMF ¶ 64); Dkt. 5 at 58–76. The accommodation request rehashed the same accusations against PPL and Plaintiff's supervisors that she had previously raised, but also alleged that her supervisors were retaliating against her for filing an EEO complaint. Dkt. 5 at 60–67. As an accommodation, Plaintiff requested "[i]mmediate removal from the USAID PPL Bureau . . . to a safe[,] non-threatening work environment." *Id.* at 62 (emphasis omitted).

In support of her request, Plaintiff attached several letters from her doctors. One letter from her cardiologist recommended that she be excused intermittently for the next two weeks for medical testing. *Id.* at 70. All of the other letters were from Plaintiff's psychiatrist, Dr. Pepper, who asserted that Plaintiff had "developed Post Traumatic Stress disorder (PTSD)," "panic attacks, severe anticipatory anxiety of going back to the same hostile environment, and [d]epression," as a result of a hostile work environment. *Id.* at 68, 71–73. Plaintiff supplemented her request with further letters from her doctors in the following weeks. Dkt. 83-

6

22 at 37–42 (Ex. 20); Dkt. 96 at 47–52; Dkt. 83-2 at 14–15 (SUMF ¶¶ 68–72).  One—a May 19, 2014 letter from Dr. Jiho Choi—"concur[red] with Dr. Pepper's medical recommendations that [Plaintiff] needs to be transferred immediately to another office, a non-hostile atmosphere."  Dkt. 96 at 51 (Ex. 1).  A May 22, 2014 letter from Dr. Pepper made a rare reference to specific conduct causing Plaintiff's concerns: that her new supervisor, Rader, forced her to leave a note indicating where she was going each time that she left her office chair.  Dkt. 96 at 48 (Ex. 1).  In this letter, Dr. Pepper requested that USAID "make arrangements to immediately remove and relocate Ms. Husain to an agency outside USAID, preferably the Department of State, . . . or other Federal agencies for the period of at least one year via the Federal 'Detail' process."  *Id.* (Ex. 1).  Plaintiff supplemented Dr. Pepper's request that same day with an email in which she stated, "[f]or my reasonable accommodation, I request to go for a one[-]year Detail outside of USAID, ASAP."  Dkt. 5 at 53.

A representative from OCRD responded to Plaintiff on May 29, 2014, asking her to complete and to send back an authorization form to allow her doctors to release medical information to OCRD so that the Office could "discuss or seek clarification from [her] doctors on the information provided."  Dkt. 83-2 at 15 (SUMF ¶ 73); Dkt. 83-22 at 53 (Ex. 20).  In reply, Plaintiff—copying others, including Dr. Pepper—stated that the letters from her doctors had "provided all necessary medical information" and that because the letters provided her physicians' contact information, OCRD should "contact them directly" for "further medical clarity."  Dkt. 83-22 at 51 (Ex. 20).  Plaintiff also indicated that she "give[s] Dr. Pepper[] [her] permission to respond to any/all medical clarity that USAID/OCRD Office is now requiring."  *Id.* (Ex. 20). "Therefore," Plaintiff concluded, "it is not necessary for me to sign the attachment."  *Id.* (Ex. 20).

In the following weeks, Plaintiff was repeatedly out sick.  Dkt. 83-2 at 16–17 (SUMF ¶¶ 75–78).  It appears from the record that OCRD did not communicate with Plaintiff further about her request for an accommodation, although she followed up on June 16 and June 26, 2014 and noted that OCRD had not provided any final decision on her request.  Dkt. 83-22 at 48–50 (Ex. 20).  On July 8, 2014, Plaintiff received a notice of proposed termination from her supervisor, Patricia Rader.  Dkt. 83-2 at 17 (SUMF ¶ 79).  Among other grounds, the notice relied upon (1) Plaintiff's failure to produce any work product since returning to work on April 21, 2014, and (2) her failure to maintain a regular work schedule as a result of taking more than 200 hours of sick leave since April 21, 2014, with no definite plan to resume work, notwithstanding abandonment of her worker's compensation claim and a resultant lack of "basis for believing [Plaintiff] could be suffering harm in the workplace."  Dkt. 83-56 at 2–4 (Ex. 54).  Plaintiff appealed her removal, but, after several delays, her termination was eventually affirmed by Alex Their, the "Assistant to the Administrator, PPL."  Dkt. 46 at 25 (2d Am. Compl. ¶ 123); Dkt. 83-2 at 17–18 (SUMF ¶¶ 79, 81, 85).

## B.    Procedural History

Plaintiff commenced this action on May 8, 2015.  Dkts. 1–8.  In 2016, this Court dismissed most of her claims in *Husain I*, 2016 WL 4435177.  Husain, represented by counsel at the time, filed a second amended complaint on June 9, 2017, alleging that USAID engaged in unlawful retaliation to punish her for filing EEO complaints (Count I), violated Title VII by taking discriminatory adverse employment actions against her (Count II), and denied her reasonable accommodations for her disabilities in violation of the ADA and the Rehabilitation Act (Count III).  Dkt. 46 at 26–30 (2d Am. Compl. ¶¶ 128–49).  After a number of delays due to Husain's medical condition, the appointment and withdrawal of counsel, unsuccessful settlement

negotiations, and discovery, USAID moved for summary judgment in February 2020. Dkt. 83. The Court granted summary judgment to USAID as to Husain's Title VII claims, Counts I and II, and denied the motion with respect to Husain's Rehabilitation Act claim in Count III. *Husain II*, 2021 WL 663206, at *1.[2]  In September 2021, USAID filed a renewed motion for summary judgment with respect to Count III. Dkt. 93.  Husain, proceeding *pro se*, opposes that motion. Dkt. 96.

## II. LEGAL STANDARD

Summary judgment is warranted if a party can "show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a).  A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  In construing the facts, the Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmovant's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving

---

[2] The Court also dismissed Plaintiff's ADA claim because "the Rehabilitation Act provides the exclusive judicial remedy for federal employees who allege that they are victims of workplace discrimination based on disabilities." *Husain II*, 2021 WL 663206, at *16 (citing *Richardson v. Yellen*, 167 F. Supp. 3d 105, 118 (D.D.C. 2016)).

party's favor with respect to the "element[s] essential to that party's case, and on which that

party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895

(D.C. Cir. 2006)).  The nonmoving party's opposition, accordingly, must consist of more than

unsupported allegations or denials, and must be supported by affidavits, declarations, or other

competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See*

Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323.  "[A] complete failure of proof concerning

an essential element of the nonmoving party's case," in other words, "renders all other facts

immaterial." *Celotex Corp.*, 477 U.S. at 322; *see also Durant v. District of Columbia*, 875 F.3d

685, 696 (D.C. Cir. 2017) (concluding that the moving party "need only identify the ways in

which the plaintiff has failed to come forward with sufficient evidence to support a reasonable

jury to find in [her] favor on one or more essential elements of [her] claim" (citation omitted)).

"Where the nonmoving party is proceeding *pro se*, courts in this jurisdiction will construe

the non-moving party's filings liberally." *Cunningham v. U.S. Dep't of Just.*, 40 F. Supp. 3d 71,

82 (D.D.C. 2014) (collecting cases).  But on a motion for summary judgment, a *pro se* plaintiff is

held to the same evidentiary burdens as those represented by counsel and must therefore

"'provide evidence that would permit a reasonable jury to find' in his favor." *Prunte v. Univ'l

Music Grp.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010) (quoting *Lanningham v. U.S. Navy*, 813

F.2d 1236, 1242 (D.C. Cir. 1987)), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011) (per curiam).  And

because a trial court is not "obliged to sift through hundreds of pages . . . to make [its] own

analysis and determination of what may[] or may not" support the plaintiff's claims, *Twist v.

Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988), "the Court may assume that facts identified by the

moving party in its statement of material facts are admitted, unless such a fact is controverted in

the statement of genuine issues filed in opposition to the motion," Loc. Civ. R. 7(h); *see also*

10

*Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 212 n.2 (D.D.C. 2017).

## III.  ANALYSIS

Plaintiff claims that USAID violated the Rehabilitation Act "by denying her reasonable accommodation for her disabilities, including a breakdown in her physical health and severe emotional distress." Dkt. 46 at 29 (2d Am. Comp. ¶ 145).  To prevail on a failure-to-accommodate claim under the Rehabilitation Act, a plaintiff "must produce sufficient evidence that (1) she was a qualified individual with a disability, (2) [her employer] had notice of her disability[,] and (3) [her employer] denied her request for a reasonable accommodation." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014); *see also Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007).  USAID's renewed motion for summary judgment does not dispute whether Plaintiff was disabled or whether the agency had notice of her disability.  *See* Dkt. 93-1 at 11, 14.  The only relevant issues at this stage, then, are "whether [Husain] could have done her job with a reasonable accommodation" and "if so, whether [USAID] actually or constructively denied her such assistance." *McNair v. District of Columbia*, 11 F. Supp. 3d 10, 14 (D.D.C. 2014); *see also* Dkt. 93-1 at 14.

A requested accommodation is "reasonable" if it "allows the employee to fulfill all essential functions of her job without imposing an undue hardship on the employer." *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009) (citing 29 C.F.R. § 1614.203(c)(1)).  "The employee has the burden of identifying reasonable accommodations, and the agency has the burden of showing undue hardship." *Id.*  Where, as in Plaintiff's 2014 accommodation request,[3]

---

[3] Defendant correctly notes that, as to Plaintiff's 2013 request for accommodation, this Court previously concluded that Plaintiff terminated the interactive process and thus "cannot prevail on

Plaintiff requests reassignment to a vacant position, it is "the plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions." *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 60 (D.D.C. 2012) (citation and internal quotation marks omitted); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1304 n.27 (D.C. Cir. 1998) ("[Plaintiff] had an obligation to demonstrate that there existed some vacant position to which he could have been reassigned."); *Alston v. Wash. Metro. Area Transp. Auth.*, 571 F. Supp. 2d 77, 82 (D.D.C. 2008) (noting that the plaintiff "bears both the burden of production and the burden of persuasion on the question whether a suitable vacancy existed at the time [she] sought transfer" (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 567 (2d Cir. 2000))); *Lester v. Natsios*, 290 F. Supp. 2d 11, 25 (D.D.C. 2003) ("With respect to reasonable accommodation, it is plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions.").

At summary judgment, the moving party is not required to prove a negative; if the nonmoving party bears the burden of proof on a dispositive issue, the moving party need only "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (noting that district courts may grant summary judgment in such circumstances). In this respect, the summary judgment standard is similar to the standard for directing a verdict. *See Anderson*, 477 U.S. at 251. The relevant "inquiry under each" is essentially the same: Does "the evidence present[] a sufficient disagreement to require submission to a jury or . . . is [it] so one-sided that one party must prevail as a matter of law?"

---

a failure-to-accommodate claim" relating to that request. *Husain II*, 2021 WL 663206, at *17 (citing *Ward*, 762 F.3d at 33–35); *see* Dkt. 93-1 at 19 n.8. To the extent the Court did not enter summary judgment as to any Rehabilitation Act claim arising from Plaintiff's 2013 request for accommodation in *Husain II*, the Court does so now.

*Id.*  Or, to put it most simply, there is no point in incurring the expense and burden of a trial on the merits if, at the end of the day, the nonmoving party cannot prevail because she has failed to elicit—in discovery or otherwise—*any* evidence supporting an essential element of her claim.

In USAID's view, this is such a case, and the Court agrees.  Notwithstanding Plaintiff's burden "to demonstrate that there existed some vacant position to which [s]he could have been reassigned," *Aka*, 156 F.3d at 1304 n.27, she has failed to identify any position—much less a suitable position—that was open when she requested a transfer in 2014.  At most, the letters from Plaintiff and her doctors suggest vague transfer possibilities, including that she be relocated via the "federal detail" process, Dkt. 5 at 53; Dkt. 46 at 17–19 (2d Am. Compl. ¶¶ 89, 94), to "an agency outside USAID, preferably the Department of State," Dkt. 96 at 48 (Ex. 1).  But these requests did not identify any vacant position within or "outside USAID" to which Plaintiff could have been detailed at that time.  They are, rather, akin to the vague transfer requests this Court found insufficient in *Senatore v. Lynch*, 225 F. Supp. 3d 24 (D.D.C. 2016), where the plaintiff sought "a job as a GS-11" that would allow her "to utilize [her] research, interpretive, and analytical skills."  *Id.* at 39; *cf. Harris v. Chao*, 257 F. Supp. 3d 67, 83 (D.D.C. 2017) (denying defendant's motion for summary judgment where plaintiff "identifie[d] 11 job postings that he claim[ed] he was qualified for and flagged during the reassignment process" (footnote omitted)).

Even more importantly, to this day—after Plaintiff has had the opportunity to take discovery and to explore whether a suitable position was, in fact, vacant, and after USAID has pointed to Plaintiff's lack of essential evidence in its motion for summary judgment—Plaintiff has done nothing to fill this gap.  No matter how liberally construed, the record contains no evidence that would permit a reasonable jury to find that a suitable position existed anywhere within USAID, the State Department, or any other agency.  Nor can the Court fill this gap based

on the understanding that the State Department is a large organization with tens of thousands of positions, some of which are presumably vacant at any given time, and that the executive branch employs many times that number of people.  It is Plaintiff's burden to identify "some vacant position to which [s]he could have been reassigned," *Aka*, 156 F.3d at 1304 n.27, and neither the Court nor a jury may guess or assume, in the absence of *any* evidence, that a suitable position existed to which Plaintiff could have been detailed or transferred.  As a result, were the case to go to trial on the existing, post-discovery record, the result would be foreordained; USAID would be entitled to a directed verdict.

Notably, Plaintiff does not ask the Court to infer that some position must have been available somewhere in the United States government, nor does she make any effort to identify any suitable position that was available within USAID, the State Department, or anywhere else in the U.S. government.  Instead, her opposition to USAID's renewed motion for summary judgment turns on a single argument, which posits that a plaintiff is relieved of her obligation to identify a suitable, vacant position when the employer "refuse[s] to engage in any interactive process with [the employee]."  Dkt. 96 at 21; *see also id.* at 17.  Plaintiff is correct that once an employer has notice of an employee's disability, the Rehabilitation Act requires "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'"  *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).  The governing regulations provide, to this point, that "it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation" and that "[t]his process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R.

§ 1630.2(o)(3); *see also Ward*, 762 F.3d at 32; *Mogenhan v. Napolitano*, 613 F.3d 1162, 1167 & n.4 (D.C. Cir. 2010).  The D.C. Circuit has explained, moreover, that where this interactive process breaks down, "courts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Ward*, 762 F.3d at 32 (quoting *Sears, Roebuck & Co.*, 417 F.3d at 805).

Although USAID argued in its first motion for summary judgment that Plaintiff "either terminated the EEO process or did not comply [with USAID's requests]" as to her 2014 transfer request, Dkt. 83-1 at 28–29, its present motion does not seek to relitigate that point.  Dkt. 95 at 12 n.8.  But even assuming for present purposes that USAID was responsible for the breakdown of the 2014 interactive process, that shortcoming does not relieve Plaintiff's burden—at this stage of the dispute—to come forward with *some* evidence that a suitable vacancy existed.  To be sure, evidence that an employer failed to engage in the interactive process—or failed to engage in the process in "good faith"—might suffice to show that the employer, in effect, denied the employee's request for an accommodation.  *See Ward*, 762 F.3d at 32.  And, because the interactive process contemplates efforts by the employer and employee to "identify appropriate job vacancies," an employer's failure "to help [a disabled employee to] identify some job that the employee might be able to fill," *Aka*, 156 F.3d at 1304 n.27 (citation and internal quotation marks omitted), might show that the employer, in effect, denied the employee's request.  By declining to engage in a meaningful dialogue with the employee—about suitable accommodations, available positions, or the like—the employer has ignored its obligation under the governing regulations and, more importantly, has closed the door on the employee's request for an accommodation.

That question, however, is distinct from the question posed here.  At least for present purposes, USAID does not dispute Plaintiff's contention that the agency denied her request.  It

argues, instead, that Plaintiff has failed to carry her distinct burden of showing that a suitable vacant position existed.  Put somewhat differently, under USAID's view of the law, an employer is not liable for declining a request for a reasonable accommodation (i.e., transfer to a different position) when, in any event, no accommodation (i.e., no vacant position) was available.

Although the D.C. Circuit has yet to address this precise question, those courts that have done so have come out on USAID's side of the argument and have held that a plaintiff is not entitled to prevail on summary judgment or at trial merely because the defendant failed to engage in the interactive process.  The Second Circuit's decision in *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92 (2d Cir. 2009), is instructive.  As the court explained, an ADA (and, presumably, a Rehabilitation Act) plaintiff "must demonstrate the existence, at or around the time when accommodation was sought, of an existing position to which she could have been reassigned" and "for which she was qualified." *Id.* at 97–98.  That premise is consistent with the D.C. Circuit's admonition that an ADA plaintiff has "an obligation to demonstrate that there existed some vacant position to which he could have been reassigned." *Aka*, 156 F.3d at 1304 n.27 (citing *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997)); *see also McCreary*, 132 F.3d at 1165 ("The plaintiff bears the burden of showing that a vacant position exists and that the plaintiff is qualified for that position.").  But, building on that premise, the *McBride* decision goes on to reject the contention, which Plaintiff advances here, that a plaintiff's "failure to identify an accommodation of any form . . . should be excused in light of [the employer's] failure to engage in a sufficient interactive process intended to develop a mutually agreeable accommodation of her disability." 583 F.3d at 99.  As the decision explains, the ADA (and, by extension, the Rehabilitation Act) "imposes liability for . . . discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore

16

possible accommodations where, in the end, no accommodation was possible." *Id.* at 100. The Second Circuit then cites decisions from the First, Third, Seventh, Eighth, Tenth, and Eleventh Circuits to the same effect. *Id.* at 100–01 (collecting cases).

The only circuit that even hints at a different view is the Ninth Circuit. But, as the Second Circuit explained, the Ninth Circuit agrees "that liability attaches as a result of a failure to engage in a sufficient interactive process only 'if a reasonable accommodation would have been possible.'" *Id.* at 100 n.5 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *rev'd on other grounds*, 535 U.S. 391 (2002)). Although the Ninth Circuit has also observed that "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process," *Barnett*, 228 F.3d at 1116, the Second Circuit attributed that view to the fact that, unlike every other circuit, the Ninth Circuit places the burden of demonstrating that no accommodation was available on the "offending employer throughout the litigation." *McBride*, 83 F.3d at 100 n.5. The Second Circuit's analysis is persuasive.

The Third Circuit's analysis under the Rehabilitation Act is consistent with the Second Circuit's analysis under the ADA and is equally convincing. In *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226 (3d Cir. 2000), the Third Circuit, as did the Second Circuit in *McBride*, recognized an employer's obligation to engage in the interactive process, but nonetheless concluded that it still "falls to the employee to make at least a facial showing that there were vacant, funded positions whose essential functions [the plaintiff] was capable of performing." *Id.* at 233 (citation and internal quotation marks omitted). Quoting the Eleventh Circuit, the Third Circuit then explained that "where a plaintiff cannot demonstrate reasonable accommodation, the employer's lack of investigation into reasonable accommodation is

unimportant." *Id.* (internal quotation marks omitted) (quoting *Willis Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)).

The Second and Third Circuits, respectively, addressed two possible counterarguments and persuasively dispatched those contentions. The first argument, which the Second Circuit addressed, is the strong policy interest in encouraging employers and employees alike to engage fully in the interactive process, thereby affording accommodations expeditiously, where appropriate, and without the need for litigation. But, as the Second Circuit explained, even if employees are required to prove in litigation that a vacant position was available, employers still have powerful incentives to engage in the interactive process. To start, as noted above, an employer's failure to engage in the process in good faith might show that the employer denied a requested accommodation. "It is [also] possible," as the Second Circuit observed without deciding, "that a failure to engage in a sufficient interactive process where accommodation was, in fact, possible constitutes prima facie evidence of discrimination on the basis of disability." *McBride*, 583 F.3d at 101.

The second possible counterargument, which the Third Circuit addressed, is that the employer will typically have greater access to information about suitable vacant positions. That concern is most significant for purposes of the interactive process itself and thus explains the D.C. Circuit's admonition that employers have an "obligation to help [their employees] identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies)." *Aka*, 156 F.3d at 1304 n.27. Once the parties are in litigation, however, the employee-turned-plaintiff has at her disposal the powerful tool of discovery. "If the defendant in a failure-to-transfer Rehabilitation Act case moves for summary judgment on the ground that the plaintiff has not identified any appropriate vacant position to which the plaintiff could have been

transferred, the plaintiff may move for a continuance to permit discovery regarding such positions." *Donahue*, 224 F.3d at 234. "But after a full opportunity for discovery, a motion for summary judgment must be granted if the summary judgment record is insufficient to support a judgment in favor of the non-moving party." *Id.* (citing *Anderson*, 477 U.S. at 255–56).

Beyond the Third Circuit's response, this Court notes that the burden that the typical Rehabilitation Act plaintiff will face in resisting a motion for summary judgment premised on this ground is not a heavy one. To avoid the entry of summary judgment, a Rehabilitation Act plaintiff need not conclusively establish that a suitable, vacant position was available. She need only come forward with evidence that would permit a reasonable jury to find in her favor with respect to this requirement. The difficulty in this case, however, is that Plaintiff had failed to offer *any* evidence respecting a possible transfer or detail, despite ample opportunity to explore that question in discovery. The Court recognizes that, at this point in the litigation, Plaintiff is proceeding *pro se* and that, as result, she is not held to the same pleading standards that apply to those represented by counsel. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). But *pro se* plaintiffs remain bound by the Federal Rules of Civil Procedure, including Rule 56(e), and, like any other plaintiffs, they bear the burden of responding to a motion for summary judgment with evidence sufficient to show that the case raises a triable issue of fact. *See, e.g.*, *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015).

Finally, the Court notes that numerous decisions from this district have held that "[t]here is no independent cause of action for failure to engage in the interactive process" and have confirmed that "under the ADA and in turn, the Rehabilitation Act, there is only a cause of action for failure to accommodate generally." *Doak v. Johnson*, 19 F. Supp. 3d 259, 278 n.20 (D.D.C. 2014); *see also*, *e.g.*, *Matos v. DeVos*, 317 F. Supp. 3d 489, 497 (D.D.C. 2018), *aff'd*,

No. 18-5281, 2019 WL 2563721 (D.C. Cir. 2019) (per curiam); *McNair*, 11 F. Supp. 3d at 16; *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005). *But see Ward v. District of Columbia*, 211 F. Supp. 3d 58, 68 (D.D.C. 2016) (suggesting that an agency's failure to engage in the interactive process might preclude summary judgment where "it [was] unclear the extent to which there were vacant positions for which Plaintiff was qualified"). Although the D.C. Circuit has made clear that an agency cannot "cause a breakdown in the process for the purpose of . . . avoiding . . . liability," *Ward*, 762 F.3d at 32 (quoting *Sears, Roebuck & Co.*, 417 F.3d at 805), there can be no failure to accommodate where no accommodation was available (*e.g.*, where there was no suitable vacancy) at the relevant time.

The Court, accordingly, rejects Plaintiff's contention that USAID "already lost the reasonable accommodation claim when the employer . . . failed to engage in the mandatory interactive process," Dkt. 96 at 17, and, instead, holds that Plaintiff retains throughout litigation the antecedent burden of establishing that a suitable vacancy existed. *See Geter v. U.S. Gov't Publ'g Off.*, 436 F. Supp. 3d 227, 234 (D.D.C. 2020) ("[O]nce a case reaches litigation, it falls to the plaintiff to 'demonstrate that there existed some vacant position to which he [or she] could have been reassigned.'" (footnote omitted) (quoting *Aka*, 156 F.3d at 1304 n.27)). Where, as here, Plaintiff has not—even after a full opportunity for discovery—made *any* showing of a vacant position to which she could have been reassigned, Defendant's failure to engage in the interactive process cannot entirely relieve Plaintiff of her burden to establish that she "could have done her job with a reasonable accommodation." *See McNair*, 11 F. Supp. 3d at 14.

Finally, the Court notes that Plaintiff devotes the bulk of her opposition brief to the contention that USAID is estopped from moving for renewed summary judgment because it did not move to dismiss Plaintiff's Rehabilitation Act claim at the motion-to-dismiss stage. Dkt. 96

at 11.  Plaintiff raised a similar argument as to her Title VII claims in opposition to USAID's

first motion for summary judgment, Dkt. 87-1 at 6, and the Court explains, as it did in response

to that argument, that "a defendant does not lose the right to move for summary judgment on a

claim merely because it did not move to dismiss that claim."  *Husain II*, 2021 WL 663206, at

\*12.  To the extent Plaintiff seeks to invoke the doctrine of judicial estoppel to revive her Title

VII claims that this Court has previously dismissed, Dkt. 96 at 12–15, moreover, the Court

necessarily declines to do so on the same grounds.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendant's renewed motion for

summary judgment, Dkt. 93.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 23, 2022